IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 24, 2024 Session

## JONATHAN M. COOPER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 118011    Steven W. Sword, Judge**

---

**No. E2022-01776-CCA-R3-PC**

---

The Petitioner, Jonathan M. Cooper, appeals the denial of his petition for post-conviction relief challenging his multiple convictions for aggravated sexual battery, incest, and rape of a child.  On appeal, the Petitioner argues the post-conviction court erred in denying his motion to continue the evidentiary hearing requesting more time to develop recently discovered evidence—the report of the victim's medical examination.  The Petitioner also contends the post-conviction court erred in denying relief because (1) the State violated his due process rights by failing to disclose *Brady* evidence at trial, i.e., the report of the victim's medical examination; (2) he received the ineffective assistance of counsel due to trial counsel's failure to familiarize himself with Rule 412 of the Tennessee Rules of Evidence, and this failure resulted in the exclusion of evidence of the victim's sexual behavior with her stepbrother; (3) he received the ineffective assistance of counsel due to trial counsel's failure to object to the State's improper closing argument; (4) he received the ineffective assistance of counsel due to trial counsel's failure to properly address the issue of venue; and (5) the cumulative effect of trial counsel's deficiencies, along with the State's withholding of *Brady* evidence, violated his right to a fair trial.  After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TOM GREENHOLTZ, JJ., joined.

Eric Lutton, District Public Defender; and Jonathan Harwell (at hearing and on appeal), and Joseph Sandford (at hearing), Assistant District Public Defenders, for the appellant, Jonathan M. Cooper.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Nathaniel Ogle, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I.  FACTUAL AND PROCEDURAL HISTORY

A.  Trial

In 2016, the Petitioner was charged by presentment with two counts of aggravated sexual battery, five counts of incest, and five counts of rape of a child.  *See* Tenn. Code Ann. §§ 39-13-504, -522; -15-302.  These allegations involved the Petitioner's alleged sexual abuse of his biological daughter, F.C.,[1] and were alleged to have occurred at different locations over two sequential time periods: first, between May 28, 2013, to May 27, 2014, at the victim's grandparent's house, where the victim stayed with the Petitioner and other relatives; and second, between May 28, 2014, to April 2015, at an apartment in Country Oaks Apartments, where the Petitioner and his wife, the victim's stepmother, later moved.  *See State v. Cooper*, No. E2018-00622-CCA-R3-CD, 2019 WL 2185219, at *1-2 (Tenn. Crim. App. May 21, 2019), *perm. app. denied* (Tenn. Sept. 18, 2019).

At the outset of the March 2017 trial, the trial court asked the parties if there were any preliminary matters to address.  The prosecutor stated that he wanted to make the trial court aware "that there was no [Rule] 412 notice in this case" and that the State, therefore, "wouldn't expect any testimony regarding any other sorts of sexual acts on the part of the victim[,]" who was twelve years old at the time of trial.  Thereafter, trial counsel indicated that he did not have any preliminary matters for the trial court on behalf of the defense. The trial proceeded.

> The victim [provided her birthdate and] testified . . . that the [Petitioner] is her father.  Initially, the [Petitioner] lived with his parents, the victim's grandparents, and he had custody of her "every weekend."  The victim testified that she would stay with the [Petitioner] in his bedroom where she had a small bed to herself.
>
> The victim testified that one night, when she was "[a]bout nine" and in the fourth grade, the [Petitioner] closed the door to his bedroom and told her to come to his bed.  The [Petitioner] then "started touching [her] private parts" over her clothing.  The victim explained that her "private parts" were her "[b]oobs and vagina."  When he was finished, the [Petitioner] told the victim to go back to her bed.  The victim testified that she did not tell anyone

---

[1] It is the policy of this court to refer to minors and victims of sexual offenses by their initials.

about this because she "was scared." According to the victim, this happened "[l]ike three or four times." During these incidents, the [Petitioner] would instruct the victim to take off her clothes and touch his penis. The victim recalled an incident at her grandparents' house when the [Petitioner] "put his penis in [her] mouth and kissed and licked [her] privates."

The victim testified that around the time she turned ten and started the fifth grade, the [Petitioner] got married and moved into an apartment with his wife. The [Petitioner] and his wife had a baby . . . in June 2014. The victim testified that she shared a bedroom with her baby brother when she stayed with the [Petitioner].

The victim recalled that, late one night, the [Petitioner] entered her bedroom and took her baby brother out of the room. The [Petitioner] returned to the room without the baby, he shut the door, took off his clothes, and took off the victim's clothes. The victim testified that the [Petitioner] then started "kissing and touching" her "vagina and boobs." The victim testified about another incident when the [Petitioner] took her baby brother out of the bedroom, came back without the baby, took off both of their clothes, and "[p]ut his penis in [her] mouth and was touching and licking [her] private." When he finished, the [Petitioner] had her put on her clothes and go back to bed.

The victim testified that the final incident occurred at the [Petitioner's] apartment when she was eleven. On that night, the [Petitioner] penetrated her vagina with his penis. The victim testified that the [Petitioner] was "[g]oing back and forth" with his penis for "a short amount of time" before the [Petitioner] "took his penis out of [her] vagina and put white stuff on [her] stomach." The [Petitioner] then put his clothes on, took the victim to a bathtub, and "washed it off." The victim testified that she dried off, dressed, and went back to bed.

After the last incident, the [Petitioner] and his wife moved from their apartment to a house. The victim testified that she "waited for a little bit after [the Petitioner] moved into his new house" to tell her mother because she was "nervous about what they were gonna say and still scared." In November 2015, the victim told her mother about what the [Petitioner] had done. The victim explained that she "didn't want it to happen any longer."

The victim testified that no one had told her what to say, that her testimony was the truth, and that what she had testified to had really happened. The victim testified that she did not sleep in a separate bedroom at her grandparents' house when these incidents occurred. The victim clarified that she only slept in a separate bedroom at her grandparents' house "after this like quit." Additionally, the victim was inconsistent about when the last incident took place. The victim initially testified that it occurred during the summer, after school had ended for the year. The victim then testified that it occurred before her birthday in May, maybe in April, but before school had ended for the year.

*Cooper*, 2019 WL 2185219, at *1-2.

In addition to these details,[2] the victim also testified that at the time of trial, she was twelve years old, was in the seventh grade, and attended a middle school in Union County. She confirmed that her grandparents' house was located in Knox County and that the apartment the Petitioner moved to in 2014, when she was around ten years of age, was located inside Country Oaks Apartments complex. When the Petitioner and his wife moved into the apartment, the Petitioner's wife's mother still lived there, but the Petitioner's wife's mother subsequently moved out. The victim described who stayed where and the furniture in the bedrooms over the time period she visited with the Petitioner at the apartment. The victim testified that when she was around eleven, the Petitioner and his family moved from the apartment to a residence on Ellison Road.

The victim also confirmed that she was interviewed about these allegations at the ChildHelp center by a woman named "Nicole." The victim stated that after this interview, she had remained at her mother's house "ever since[.]"

On cross-examination, trial counsel asked the victim about her testimony on direct examination that she had remained in the home with her mother and stepfather "ever since" reporting these allegations. When prompted, the victim agreed that this was not "really true[.]" The victim then stated, "But like when I moved out of my dad's, I was there." When trial counsel again attempted to clarify if the victim had remained at her mother's ever since, the prosecutor objected, and a bench conference ensued.

The prosecutor indicated trial counsel was "about to try and go into a brief period" when the victim was in the custody of the Department of Children's Services ("DCS") due

---

[2] By order dated April 20, 2023, this court granted the Petitioner's motion to take judicial notice of the underlying trial record in this case. *See State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009) (noting that this court may take judicial notice of its own records).

- 4 -

to sexual activity with her stepbrother. The prosecutor asserted that "this line of questioning," which was "starting to go down that path," was irrelevant. Trial counsel responded that the evidence was first relevant because the question bore on the witness's character for truthfulness. Trial counsel then argued the evidence was relevant for an additional reason: "After this incident, she went to her mother's house and was perped on by the stepbrother, and the reason why this is relevant is she had the testimony about ejaculation[.]"

The trial court interjected that this was "412 stuff[,]" to which trial counsel agreed. Trial counsel observed the State would likely argue the victim only gained knowledge of sexual matters based upon her interactions with the Petitioner, and the prosecutor replied he would not be arguing such. Trial counsel then said this was "not a question of her sexual history[,]" to which the trial court disagreed. The trial court ruled,

> And to show basis of knowledge is one of those reasons under 412 that you can delve into this stuff, but we specifically asked at the beginning, and you said you weren't going into it so you're precluded from it. I don't think there's any reason to get into the DCS stuff, so I'm going to grant the State's objection. You can't pursue this line of questioning.

The bench conference ended, and testimony resumed.

After the victim's testimony, the victim's mother testified that she and the Petitioner were both eighteen years old when the victim was born. After their relationship ended, they arranged a visitation schedule for the victim, which consisted of "every other week until [the victim] reached school age, and then she would stay with [her mother] during the week for school, and then she would go visit [the Petitioner] on the weekends." To facilitate the victim's exchange, she would meet with the Petitioner or his family member first at "the CVS in Halls" and then later at "the TVA in Halls." The victim's mother confirmed that the victim initially visited the Petitioner at his parents' house and later at an apartment in Country Oaks Apartments. The victim's mother also confirmed that the Petitioner's parents' house was located in Knox County.

> The victim's mother . . . testified that she noticed that the victim had become "really withdrawn" from the time she was nine until she reported the abuse when she was eleven. [The victim's mother] explained that this was especially noticeable when she would pick the victim up from her weekend visitations with the [Petitioner]. However, [the victim's mother] admitted that the victim was not "withdrawn" at every pickup.

- 5 -

*Cooper*, 2019 WL 2185219, at *2. In addition, the victim's mother testified that since the end of 2015, the victim was "a much happier child[,] . . . like a weight's been lifted off of her."

On cross-examination, the victim's mother affirmed that there was a total of five children in the household she shared with her husband—three were stepchildren, one was the victim, and one was the child of the victim's mother and stepfather. The victim's mother confirmed that the family had taken two trips to Florida, once when the victim accompanied them to Disney World, and another when the victim did not accompany them on the trip. However, the victim's mother clarified that the victim was twelve years old at the time of the family trip when the victim did not accompany them, so the trip had been recent.

Knoxville Police Department ("KPD") Investigator Shaun Sakovich testified that he was a police officer with the Special Crimes Unit and that he had worked with the KPD since 2008. Inv. Sakovich said that in November 2015, he was assigned to investigate allegations of sexual abuse levied against the Petitioner, following a DCS referral from Karen Orsulak. Ms. Orsulak had arranged a forensic interview for the victim at ChildHelp, which Inv. Sakovich attended. Inv. Sakovich testified that he observed the victim through a two-way mirror during her forensic interview at the ChildHelp facility and that she "cried for an extended period of time." *Cooper*, 2019 WL 2185219, at *2.

In addition, the day after the victim's forensic interview, Inv. Sakovich attempted to contact the Petitioner at the Petitioner's workplace, a radio station "off of Old Kingston Pike," but the Petitioner was not present. Inv. Sakovich "learned that [the Petitioner] was at . . . another position doing part of his job" at a car dealership on Parkside Drive, so Inv. Sakovich proceeded to that location. Once at that location, Inv. Sakovich located the Petitioner and spoke with him about these allegations. According to Inv. Sakovich, the Petitioner's demeanor during the interview "started off as confusion and then went more towards like worry and concern[.]" Inv. Sakovich then returned to the Petitioner's workplace off of Old Kingston Pike to speak with the Petitioner's wife. Inv. Sakovich described the Petitioner's wife as "very assertive" when he spoke with her.

Inv. Sakovich testified that through conversations with the Petitioner, as well as "some background investigation" that included a review of "driver's license records[,]" he was able to determine that the Petitioner lived at three different locations during the relevant time period. Inv. Sakovich stated that he "believed" the Petitioner moved from his parents' home to an apartment in Country Oaks Apartments in the summer of 2014 and that, in the summer of 2015, the Petitioner moved to a residence on Ellison Road. Inv. Sakovich said that his recollection of these dates was based "off of like birthdays and

things" that he could remember. Inv. Sakovich also contacted "the management company at a particular apartment complex and confirm[ed] that [the Petitioner] was a tenant there for . . . a given period of time via their paper records."

Inv. Sakovich went to the Petitioner's parents' house and interviewed the Petitioner's parents and the Petitioner's sister and observed the various rooms inside the house. At one point, Inv. Sakovich, along with an assistant district attorney general, went to the victim's school, and Inv. Sakovich observed the prosecutor speak with the victim.

At the close of Inv. Sakovich's direct examination, Inv. Sakovich was asked, "At the conclusion of your investigation . . . what did you do?" Inv. Sakovich replied that he "turned over [his] case file" to the prosecutor. Inv. Sakovich was then asked, "And did all these events take place here in Knox County?", to which he responded affirmatively.

Thereafter, the State rested its case. The Petitioner moved for a judgment of acquittal, arguing that the evidence was insufficient to support the charges, given the victim's inconsistent testimony and the State had not proven that the allegations occurred within the timeframes listed in the indictment. The trial court denied the motion, and the defense proceeded with its proof.

At the outset of the defense proof, the parties stipulated that "in a prior interview," the victim had reported that the Petitioner "inserted his penis into her vagina and that this act occurred at the end of summer, 2015." The defense then called the Petitioner's father, who testified

> that the victim would sleep in his and his wife's bed when she stayed at their house for the victim's visitations with the [Petitioner]. The [Petitioner's] father testified that they placed a toddler bed for the victim in the [Petitioner's] bedroom in 2008. However, she continued to sleep in their bedroom with him and his wife. According to the [Petitioner's] father, in 2010, they removed the toddler bed and placed a futon in a separate bedroom for the victim. The [Petitioner's] father testified that the victim never actually slept on the futon. Instead, she continued to sleep in his bedroom with him and his wife. The [Petitioner's] father also testified that he had never known the victim to lie.

*Cooper*, 2019 WL 2185219, at *2.

The Petitioner's father was also asked on direct examination about when the Petitioner moved from the family home. The Petitioner's father indicated the Petitioner

- 7 -

moved out of the home once the Petitioner married in 2013. The Petitioner's father was asked where the couple lived after returning from their honeymoon, to which the Petitioner's father replied, "He lived at their apartment . . . over in Pond Gap area. I don't even—." Trial counsel interjected, "On Papermill?" and the Petitioner's father said, "I don't even know the name of it. I couldn't tell you the name. The Petitioner's father averred that he would "beat the crap out" of the Petitioner if he thought these allegations were true.

On cross-examination, the Petitioner's father confirmed that Inv. Sakovich spoke with the Petitioner on a Friday and that the family often had lunch together on Sundays. He confirmed he had a conversation with the Petitioner about these events.

"The [Petitioner's] sister testified similarly [as the Petitioner's father] about the sleeping arrangements at the [Petitioner's] parents' house." *Cooper*, 2019 WL 2185219, at *2. She confirmed that the Petitioner was married in May 2013 and that the Petitioner moved into an apartment with his wife thereafter. On cross-examination, the Petitioner's sister was questioned about her opinion of the victim's character for truthfulness, and she said that victim had never lied to her but that the victim had "not always been honest with telling others the truth[.]"

The Petitioner's wife affirmed that she married the Petitioner in May 2013 in Knoxville and that they immediately left for their honeymoon after the ceremony. She testified that she shared an apartment with her mother prior to her marriage to the Petitioner and that the Petitioner moved into that three-bedroom apartment following the marriage. The Petitioner's wife's son from an earlier relationship also lived there. The Petitioner's wife confirmed that her mother moved from the apartment in September 2013. Thereafter, the couple had a child in June 2014.

> The [Petitioner's] wife confirmed that the victim and [the victim's baby brother] shared a bedroom in their apartment. The [Petitioner's] wife testified that [her son] "was a very fussy and clingy newborn," who did not sleep well and was up "every two to three hours." The [Petitioner's] wife also testified that she had no indication that there was anything "unusual going on" at their apartment.

*Cooper*, 2019 WL 2185219, at *2.

On redirect, the Petitioner's wife was asked "how did [the victim] take [her baby brother's] birth." The Petitioner's wife replied that the victim "was slightly upset."

- 8 -

"The [Petitioner's] mother-in-law, who lived with the [Petitioner] and his wife in their apartment for several months, testified that she never noticed anything unusual when she lived with them." *Id.*

On direct examination, "[t]he [Petitioner] denied touching the victim 'inappropriately'" and "denied ever penetrating the victim's vagina or engaging in any sex acts with her." *Id.* On cross-examination, "[t]he [Petitioner] claimed that the victim never slept in his bedroom when he lived at his parent's house. The [Petitioner] also claimed that he had never been alone with the victim, except for possibly being in a car alone." *Id.* When the Petitioner was asked about his statement to Inv. Sakovich that he never changed the victim's diaper, the Petitioner explained, "I respected the mother's position as the caretaker of the child. I was raised that the mother changes the diaper of a baby based on gender." The Petitioner clarified he might have changed the victim's diaper a few times but only did so in emergency situations. The Petitioner also confirmed he told Inv. Sakovich that he never kissed the victim on the lips. When asked if he had told Inv. Sakovich that he had probably not spent "a hundred hours in the past year" with the victim, the Petitioner replied that he could not provide "a ballpark figure" but affirmed that he had not spent very much time with the victim over the past year.

In addition, the Petitioner affirmed that he spoke with his wife prior to her ever being questioned by law enforcement. The Petitioner confirmed that he often had lunch with his parents on Sundays, but he averred, "I did not talk to every single one of these people." He agreed that he had spoken to his witnesses prior to trial.

At the conclusion of the defense proof, trial counsel renewed his motion for judgment of acquittal, revisiting the issue of the victim's credibility as it pertained to the timing of her allegations. However, this motion was denied, and the parties proceeded with closing arguments.

In the State's initial closing argument, the prosecutor asserted that credibility was the central issue in this case, saying that it would "come down to whether or not" the jurors believed the victim or the Petitioner. The prosecutor, discussing why the jurors should believe the young victim, noted that the victim "didn't get five minutes into that direct" before she started to cry, the "emotion on her face" was visible, and there was "sincerity in the story she told[.]" The prosecutor affirmed that "[s]he was very sincere[,]" noting the victim's "body language, her demeanor, [and] the vivid nature of her description."

As to the issue of "potential corroboration" of the victim's story, the prosecutor said the victim's mother had "no motive to . . . lie about this." The prosecutor then described the "change[]" in the victim's demeanor as observed by the victim's mother:

"She wasn't playing with her . . . stepbrothers in the car like she would normally be when they were driving back to their house. Instead, she was withdrawn. She was upset."

The prosecutor next contended the Petitioner had testified to "some amazing things." The prosecutor submitted that after the Petitioner spoke with Inv. Sakovich, he then spoke "to every single person from his immediate family" prior to their being interviewed by law enforcement. According to the prosecutor, "they had an opportunity to collaborate" and "to try to get their stories straight," and the defense witnesses testified consistently with this preplanned story.

The prosecutor claimed the Petitioner tried "to minimize any contact that he had with his daughter" when questioned by Inv. Sakovich, noting that the Petitioner "wanted to impress upon" Inv. Sakovich that he had "never once" changed the victim's diaper, "never spent any time alone with" the victim, and spent less than "a hundred hours with her for the past year." The prosecutor commented that "when [he] listened to that interview[,] [he] thought, that's weird." The prosecutor asked, "Why would the [Petitioner] go to such great, almost ridiculous, lengths to minimize the contact he had with his daughter?" The prosecutor then told the jurors, "I would submit to you that that's because he was scared" knowing "this story was finally coming out," and the Petitioner needed to "create some separation between he and [the victim]."

The prosecutor also pointed out that the Petitioner's father said the victim was "an honest little girl" and a "truthful young lady." The prosecutor surmised, "Members of the jury, [the victim] did not lie about this. She didn't make this up. . . . She described in great detail the first time something happened between she and her dad." The prosecutor concluded, "And I'm confident that by the close of proof you will be convinced by any reasonable doubt that [the victim] is not lying about these things[.]"

Trial counsel started closing argument by stating, "So you have to decide who you believe." Trial counsel asserted that it was "inaccurate to say [the victim testified] in great detail" and that it was not "borne out" by the proof that the Petitioner's family was "a bunch of liars." According to trial counsel, there was nothing "sinister" about the Petitioner's talking with his family after he was approached by Inv. Sakovich.

As to the allegations in the apartment, trial counsel recounted that the victim's baby brother was "a fussy baby" and that the victim's story about the Petitioner's removing the baby from the room and then returning the baby to the room without waking the baby "just [did not] make sense." Trial counsel said the jurors could judge the veracity of that story "based on [their] own life experiences" and their "own common sense."

Trial counsel maintained that the jurors were likely wondering why the victim would be "lying on her father." He continued, "It's always a difficult question. But think of what you heard." Trial counsel observed the Petitioner's admission that he had spent little time with the victim during the period covering these allegations. Trial counsel noted that the Petitioner had remarried and had a new baby, which left the victim "feeling pushed out by the new family, by the new baby." Trial counsel also noted the victim's mother had taken a vacation to Florida and left the victim behind. He contended the victim was upset for these reasons, so she made up these allegations, and it was "too late" for the victim to recant because she was in "too deep."

Trial counsel commented that it was the jurors' responsibility to "judge the credibility of these witnesses" based upon what they saw in court. Trial counsel said that the jurors should not discount the defense witnesses' testimony simply because they were the Petitioner's family members. Trial counsel asserted, "His father can be an honest man. Would you lie for your child accused of raping your grandchild?"

Trial counsel pleaded with the jurors to ask themselves, "Does this make sense?", and "Am I sure?" Trial counsel further urged the jurors to respect the reasonable doubt standard of proof and not to give in "out of sympathy" for the victim or to respond based upon emotion.

The prosecutor then began his rebuttal argument by noting that "the big question" in this case was whether the victim was lying and, if so, why would she lie. The prosecutor commented that the victim had not admitted to being upset about her new baby brother and that the victim's mother indicated the missed vacation happened after the allegations against the Petitioner had already been made. The prosecutor asserted that the Petitioner had admitted to talking "to every single person that testified," giving them the opportunity to collaborate.

In discussing the allegations that occurred at the victim's grandparents' house, the prosecutor asked the jurors, "What I'm telling you is what [the victim] said. I'm asking that you listen to [the victim] and that you believe in what [the victim] said[.]" The prosecutor explained, "[T]he reason why I'm telling you that is because you are the ultimate deciders of who's telling the truth. You're the ones who get to make that decision . . . . You get to make the decision about who was telling the truth." He suggested that the victim was able to testify "in great detail about things" because these events "that [were] forever burned into her mind took place."

The prosecutor also acknowledged the victim had testified inconsistently regarding the timing of the sexual abuse but claimed she only did so because she was "nervous" and

"upset." The prosecutor maintained that the victim was young and "that sometimes kids don't remember little details[.]" The prosecutor observed that the victim clarified the timing on redirect. In conclusion, the prosecutor said,

> This little girl did not make up the fact that her dad got on top of her, took his clothes off, and put his penis inside of her vagina when she was 10 years old, and then when . . . he was done, put ejaculate on her belly. She didn't make that up. She didn't make it up. She did not make up the fact that her dad, his head was at the top of the headboard and that he told her to put his penis in her mouth. She didn't make that up. And then at same time during the same session, he then said, "You move to the top of the bed and I'm going to kiss your private." And he started to do this. She didn't make that up. That is absolute baloney, not true. These things happened to this little girl, and what she said and the story that she told you is the truth.

Thereafter, the jury convicted the Petitioner of the allegations occurring at the Country Oaks apartment—one count of aggravated sexual battery, three counts of incest, and three counts of rape of a child. *Cooper*, 2019 WL 2185219, at *1-2. The Petitioner was acquitted of the remaining charges that occurred at the victim's grandparents' house. *Id.* The trial court later imposed a total effective sentence of fifty years.

B.     Direct Appeal

The Petitioner filed a direct appeal to this court challenging his convictions, wherein he challenged the sufficiency of the evidence and raised an additional issue with Inv. Sakovich's testimony that is not relevant to this appeal. *See Cooper*, 2019 WL 2185219, at *1. Relative to the sufficiency of the evidence, the Petitioner assailed the victim's credibility, noting that the jury rejected the victim's "story regarding the events at her grandparents' house," and submitting that the victim was inconsistent in her statements about when the last incident occurred and that her testimony about the Petitioner's taking her baby brother out of the bedroom prior to sexually abusing her "strains belief." *Id.* at *2. This court concluded that sufficient evidence supported the Petitioner's convictions, observing that the testimony of a victim, by itself, was sufficient to support a conviction; that the jury was free to reject some portions of the victim's testimony while accepting others; and that issues of witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. *Id.* at *4. Ultimately, this court affirmed the Petitioner's convictions. *Id.* at *5.

C.      Post-Conviction Proceedings

        1.      Relevant Procedure

        The Petitioner's pro se petition for post-conviction relief was filed on September 17, 2020, and post-conviction counsel[3] was appointed to represent the Petitioner on January 25, 2021.  Thereafter, post-conviction counsel filed six documents titled "Status Report and Request for Extension of Time," sequentially, on February 23, 2021; April 27, 2021; June 25, 2021; September 7, 2021; November 5, 2021; and February 14, 2022.

        In the sixth "Status Report and Request for Extension of Time," post-conviction counsel averred that since the last status report, he had continued working with an investigator to locate and interview the remaining possible witnesses and had also engaged in legal research relating to this case.  Post-conviction counsel noted that he was filing several accompanying motions "seeking additional information or documentation that could be relevant to claims in the pro se petition or in any amended petition" and requesting more time for the purpose "of resolving these pending motions."  The accompanying motions included (1) a motion for preparation of transcripts of jury selection, opening statements, and closing argument; (2) a motion for discovery of any information in the possession of the State relating to the charges against the Petitioner and the claims made in the pro se petition for post-conviction relief, specifically requesting any information related to the disclosure the victim had engaged in sexual activity with her stepbrother, the way the disclosure came to light, how this revelation was treated within the family, and any subsequent developments relating to the disclosure that occurred prior to the trial in this case; and (3) and a motion pursuant to *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), for the post-conviction court to inspect the DCS records of the victim and her stepbrother, who was two years older than the victim, for material, exculpatory information pertaining to any sexual activity between the two, such as when this activity began, how often it occurred, any connection between this activity and the allegations against the Petitioner, how this activity came to light, and any punishment imposed.  Following a hearing, the Petitioner's motions were granted, and the motion for discovery was "complied with by the State."

        The post-conviction court ultimately received the records from DCS and reviewed them.  Thereafter, on May 19, 2022, the post-conviction court ruled that portions of the DCS records "contain[ed] potential exculpatory material" and that a copy of those portions would be provided to the defense subject to a protective order.  Those records included DCS documents relating to certain sexual incidents involving the victim and her

_____

[3] The Petitioner was represented by two assistant public defenders in these post-conviction proceedings.  We will refer to them collectively as post-conviction counsel.

stepbrother, as well as documents relating to DCS's involvement with the family in the aftermath of these allegations. The post-conviction court retained the remaining records under seal.

The records provided to the post-conviction defense are included in the record on appeal. One document titled "Tennessee Department of Children's Services Collateral Contact" includes details of the victim's forensic interview. It was noted therein that DCS investigator, Ms. Karen Orsulak, informed the victim's mother that due to the victim's disclosure in the interview, "another hotline call" would be placed regarding the victim's "new allegation" of sexual contact with her stepbrother and that the victim's mother "was [in] agreement." Also included was a DCS "Case Recording Summary" detailing the victim's stepbrother's forensic interview that occurred on January 15, 2016. In the interview, the victim's stepbrother said the victim "approached him asking to see him naked and then asking to perform oral sex." He indicated this had happened "a couple of times closer to the beginning of the school year[,]" but it had not happened since then. He also indicated the victim had "a problem with constantly having 'urges' and wanting to masturbate."

Post-conviction counsel filed a second motion pursuant to *Ritchie* for the post-conviction court to inspect the forensic interview of the victim's stepbrother, a copy of which was believed to be in the custody of the Union County Juvenile Court. The post-conviction court entered an order requesting the Union County Juvenile Court to provide a copy of the interview, if one existed, under seal to the post-conviction court.

On September 13, 2022, post-conviction counsel filed another *Ritchie* motion asking the post-conviction court to perform an in-camera inspection of the DCS records relating to the victim and for the post-conviction court to then disclose the information that related to the allegations of sexual abuse levied against the Petitioner. Post-conviction counsel noted that there was a claim of ineffective assistance of counsel tied to the DCS records based upon trial counsel's failure to obtain these records and that the Petitioner would be required to establish prejudice. Accordingly, post-conviction counsel requested that, following the post-conviction court's review of the pertinent records and its determination of which records related to the allegations of sexual abuse at the hands of the Petitioner, the Petitioner be allowed to review those records in camera in their entirety. The basis for this request was that trial counsel failed to ask for such a review and that the DCS records would contain references relating to the allegations; would disclose the course of the investigation of the case by DCS, including the timing and content of the initial referral, the identity of witnesses and their statements, and actions taken by the investigators.

- 14 -

However, the post-conviction court denied the Petitioner's request to review the DCS records pertaining to the victim in their entirety, finding that the Petitioner was not entitled to such review of confidential DCS records. In its September 19, 2022 order, the post-conviction court said that it had conducted "a further review of the records for potentially exculpatory information relating [to] the [P]etitioner's case" and that "[s]aid review revealed no exculpatory information."

Post-conviction counsel filed the first amended petition for post-conviction relief under seal on September 21, 2022. Shortly thereafter, on September 28, 2022, post-conviction counsel filed a motion to continue the evidentiary hearing, which was scheduled for October 6, 2022. In the motion, post-conviction counsel averred that he had discovered "two facts of potential relevance to the petition": (1) that the victim's mother did not initially report to law enforcement any allegation from the victim involving vaginal intercourse with the Petitioner, only oral sex, and (2) that the victim had undergone a forensic medical evaluation that indicated there was no injury to either her hymen or vagina. According to post-conviction counsel, it was believed that neither was known by trial counsel at the time of trial, but at minimum, it was clear that neither was used by trial counsel during the Petitioner's trial. Post-conviction counsel argued that he had insufficient time to explore this new information and to discuss it with the Petitioner.

On October 3, 2022, the post-conviction court held a hearing on the Petitioner's motion to continue the evidentiary hearing. At the outset of the motion hearing, post-conviction counsel reviewed the motion with the post-conviction court and asked for a continuance due to recent discoveries found in "last-minute preparations" for the evidentiary hearing.

Post-conviction counsel's request for a continuance first involved receipt of "information regarding the initial report that was made to the DCS hotline by a police officer . . . based on information provided by the [victim's] mother." According to post-conviction counsel, this "information differed in one significant way from the [victim's] testimony at trial, in that there was no mention of intercourse, only of oral sex," and "[i]t also indicated that the mother, when she first contacted DCS, not only failed to mention the other issue with the stepbrother, but, in fact, affirmatively asserted that the [victim] had not provided any other similar information." Post-conviction counsel asserted that this evidence could have impeached the victim's and her mother's testimony. Post-conviction counsel requested additional time to investigate whether there was a recording of that DCS hotline call and to determine the specific police officer who was initially contacted by the victim's mother and relayed the information to DCS.

- 15 -

As a second reason for a continuance, post-conviction counsel observed that "last week," they learned the victim received a forensic medical examination following her report of sexual abuse at the hands of the Petitioner. According to the report from the medical examination, "there were no injuries to the vagina or the hymen that were observed." Post-conviction counsel opined, "It may be, ultimately, that this would not have been hugely probative, but I'm not a doctor. I'm not in [a] position, really, to rule that out at this point." Post-conviction counsel noted that the State did not mention the information contained in the report at trial and submitted that "even if it wasn't immensely probative, the defense could potentially have used this to at least tell the jury, you're not getting the full story because the State's only telling you the things that help them."

In conclusion, post-conviction counsel asserted this "was a very close case" because the victim's testimony was "largely[] uncorroborated." Post-conviction counsel observed that the allegations in this case involved two different timeframes and locations and that the jury found the Petitioner not guilty of one set of offenses. According to post-conviction counsel, "even a relatively small piece of information, relatively small decision that [trial] counsel took, relatively small *Brady* matter could actually have changed the outcome of the case."

The prosecutor asked that the evidentiary hearing go forward as planned. The prosecutor opined that none of this information was new because he had the same "open-file policy" with trial counsel as he did with post-conviction counsel. The prosecutor indicated that post-conviction counsel had apparently seen this information their "second time through" the State's file and now believed it to be important; however, post-conviction counsel had been provided with prior access to these records. Furthermore, the prosecutor asserted that there was nothing material or exculpatory in these records and that there was no reason for an additional continuance.

The post-conviction court denied the Petitioner's motion to continue, noting the length of time the post-conviction petition had been pending. Specifically, the post-conviction court reasoned,

> I think, in a case like this, as we keep digging, there's always something new to discover. And I think if we continue it again and set it out six more months, you're probably going to find more things. But I think, based upon what's been brought before the [c]ourt now, it's not grounds for a continuance on a case that's been pending post-conviction for sometime now, . . . almost two years.

- 16 -

The Petitioner's second amended petition for post-conviction relief was filed under seal that same day, October 3, 2022.

2.  Issues Raised in the Petitions

In his various petitions, the Petitioner raised a number of claims for relief. Specifically, of relevance to the issues presented in this appeal, the Petitioner argued the following. First, the Petitioner argued that he was denied the effective assistance of counsel due to trial counsel's failure to file a pretrial Rule 412 motion seeking to introduce evidence the victim had engaged in sexual activity with her stepbrother. According to the Petitioner, such activity was admissible pursuant to Rule 412 and the Tennessee and federal constitutions on the questions of (a) the victim's knowledge of sexual matters and (b) the victim's motivation to fabricate allegations against the Petitioner, given that said allegations were made contemporaneously with the revelation of her sexual activity with her stepbrother and with her mother's imposition of discipline for that activity. The Petitioner submitted that because of trial counsel's failure in this regard, he was precluded from (1) using the victim's forensic interview to establish facts relating to the sexual activity with her stepbrother; (2) presenting evidence and arguing that the victim's knowledge of sexual matters derived from her sexual activity with her stepbrother, rather than from the Petitioner, and that the discovery of her sexual activity with her stepbrother provided a motive for her to fabricate the allegations against the Petitioner; (3) arguing that the reason the victim was depressed when returning home from the Petitioner's residence was not because of any abuse she suffered at the hands of the Petitioner while away, but rather, because she was returning to a home where she was either being abused by her stepbrother or in a relationship that she feared would be discovered; and (4) attacking the victim's testimony that she had been at her mother's house ever since reporting the allegations.

Next, the Petitioner claimed that trial counsel was ineffective for failing to object to multiple different statements made by the prosecutor during closing argument. The Petitioner cited numerous statements as improper, among other things, that: (1) the victim was "very sincere"; (2) the Petitioner "wanted to impress" upon Inv. Sakovich that he never changed the victim's diaper and spent limited time alone with her; (3) the Petitioner's statements to Inv. Sakovich were "weird"; (4) the Petitioner's explanations of the limits of his relationship with the victim were "ridiculous"; (5) the victim "did not lie about this" and "didn't make this up"; and (6) "She didn't make that up. That is absolute baloney, not true. These things happened to this little girl, and what she said and the story that she told you is the truth." According to the Petitioner, these comments were improper because they constituted vouching for the victim's credibility by the prosecutor, interjected the

prosecutor's personal opinions into the case, or were inconsistent with the evidence.

The Petitioner also complained that trial counsel provided ineffective assistance regarding venue. He contended that trial counsel was ineffective for failing to argue—in his motion for judgment of acquittal, in the motion for new trial, or on appeal (regardless of whether it had been argued below)—that the State did not establish venue for the offenses alleged to have taken place at the Petitioner's apartment in Country Oaks Apartments. In a similar vein, the Petitioner argued that, given the State's failure to establish venue, trial counsel was ineffective in asking the Petitioner's father where the Petitioner lived after getting married and eliciting the answer that the Petitioner lived in an apartment in the Pond Gap area, thus, potentially providing evidence of venue.

Citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Petitioner also argued that the State violated his due process rights by failing to disclose material, exculpatory evidence. Specifically, the Petitioner referenced a December 2015 report following a forensic medical evaluation of the victim, wherein it was stated that no injuries to the victim's vagina or hymen were observed.

Finally, the Petitioner asserted that he was "denied the effective assistance of counsel by the cumulative effect of the errors and omissions" he had described. The evidentiary hearing took place as scheduled on October 6, 2022.

3.      Evidentiary Hearing

        a.      Exhibits

At the outset of the hearing, the Petitioner introduced an agreed-upon stipulation regarding what the victim's testimony would have been had she testified at the hearing. The stipulation provided that the victim was the subject of a November 12, 2015 forensic interview conducted by Nicole Mullinax at the ChildHelp Children's Center of East Tennessee in Knox County. "During that interview, the victim was questioned in part about a sexual incident or incidents that occurred with her stepbrother." The stipulation specified that an approximate thirteen-minute portion of the forensic interview would be introduced as an exhibit to the post-conviction hearing and that, if the victim were called to testify at the evidentiary hearing, her testimony would be consistent with her statements in that portion of the interview. It was also stated therein that, if the victim had been asked "what answers she would have given at any pretrial hearing or at the trial in this case had she been asked relevant questions, [then] her testimony would [have been] consistent with her statements in [that] portion of the interview."

In the approximate thirteen-minute portion of the forensic interview introduced at the hearing, the victim was first asked "if anyone else besides her dad had ever done that?" The victim replied that her stepbrother had done so before. The victim indicated that it was "both" of their ideas to engage in this sexual activity.

Initially, the victim indicated that the sexual behavior started only recently after they had completed playing a game of "Truth or Dare." However, she later said that the sexual contact with her stepbrother began around the time she was nine years old. When the victim was asked to provide details of their behavior, she said that her stepbrother would "like do the same thing that happened with [her] dad." The victim relayed that her stepbrother would touch her "privates" with his hand. She indicated that this took place in her stepbrother's bedroom and that it happened two or three times in total. She then relayed that she touched him also.

At first, the victim stated that the touching was always on top of their clothes. Later, the victim explained that, once in her stepbrother's room, they would lock the door, and her stepbrother would pull down her shorts, and she would pull down his clothes as well. She would then "touch his and he would touch" hers. She explained the sexual contact first began on top of their clothes, which was why she had said that originally, but acknowledged it progressed during subsequent encounters.

The interviewer asked the victim whether there was any "licking or sucking or anything like that" with her stepbrother, to which she assented. When pressed for more details, the victim said during the "last time" with her stepbrother, they touched each other, and then she "sucked it like she did [her] dad." During that time, her stepbrother was touching her. The victim indicated that she was around ten years old when this occurred.

The victim was asked if "white stuff" ever came out of her stepbrother's body on any of these occasions, and she responded affirmatively. The interviewer inquired what was taking place when the "white stuff" came out, and the victim answered, "He would do what my dad does, like squeeze it like that," while making a hand motion.

According to the victim, no one ever saw or walked in on them while she was engaging in this behavior with her stepbrother. The victim maintained that her stepbrother had not participated in this type of behavior with anyone else. The victim also indicated that the sexual activity with the Petitioner started prior to any of the incidents with her stepbrother.

The victim indicated that both her mother and stepfather knew of this "sucking" and "licking" behavior between the two children. The victim indicated that after being asked

questions by her stepfather, she and her stepbrother disclosed their behavior. The victim relayed to the interviewer that she first divulged to her parents the abuse with her stepbrother before revealing the abuse by the Petitioner. The victim stated that she and her stepbrother were grounded for three weeks as a consequence and that they were still grounded at the time of the interview. The victim explained that her mother expressed the belief the victim had engaged in this behavior with her stepbrother because the Petitioner "had done that" to the victim and the victim was "curious" and wanted to try it with someone her "own size."

Various DCS records were exhibited to the hearing. One such document was a "Tennessee Child Abuse Hotline Summary," which indicated that the victim "gave no other information" besides the allegations that the Petitioner had "been touching her private area, kissing her in [the] mouth, and wanting [her] to perform oral sex on him."

The DCS records also included a December 11, 2015 forensic summary prepared by sexual assault nurse examiner Gail Clift ("SANE nurse") following her examination of the eleven-year-old victim. In the report, the SANE nurse stated that the victim's mother had informed her that the victim's stepfather caught the victim and the victim's stepbrother "touching each other without their clothes on" and that "[a]fter this, [the victim] disclosed . . . what was happening with [the Petitioner]." The victim was interviewed alone regarding the allegations involving both the Petitioner and the victim's stepbrother, and the SANE nurse relayed in the report the details the victim provided during that interview. After providing those details, the SANE nurse reported that the victim "had a complete physical exam including examination of her genitalia using the colposcope" and that photographs were taken during the examination. According to the SANE nurse's findings that followed, the victim's "genital exam revealed a Tanner 2-3 female"; "[n]o dermatitis was present"; "[t]he labia had no injury"; the victim's "hymen was visualized and there were no injuries"; "[t]here was early estrogen effect of the hymen"; the victim's "anal exam revealed normal anal tone"; "[n]o anal injuries were noted"; the victim "had laboratory testing for HIV, Hepatitis B and C and syphilis"; "[a] urinalysis and a urine test for gonorrhea and chlamydia were completed"; and the victim's "exam findings were consistent with the history provided."

Another document was a "Child Protective Services Investigation Summary and Classification Decision of Child Abuse/Neglect Referral." It was noted in the document that the victim was interviewed at ChildHelp on November 12, 2015, and that she "gave a very detailed disclosure of the sexual abuse she endure[d] at the hands of [the Petitioner]." The victim disclosed having oral sex with the Petitioner where he "licked her," she "sucked him," she rubbed him "up and down," and "[i]t came out rubbery and warm[.]" The victim said that when the Petitioner was finished, he would "hold it at the end until hot, white,

chunky stuff" came out on her stomach. She also said that he put his penis "in and out of her." The Petitioner instructed her not to tell anyone. The victim was able "to describe how her body reacted to the touches . . . as well." According to the victim, the abuse went on for over two years, and she finally told her mother because she wanted it to stop. It was also noted that the victim received a December 2015 forensic medical examination that was performed by the SANE nurse at ChildHelp.

The victim's forensic interview was also detailed in a "Case Recording Summary" prepared by Ms. Orsulak on December 27, 2015. Further details of the interview were provided. The victim said that she "finally felt comfortable" having sex with the Petitioner because they "had done it so much." According to the victim, they had engaged in intercourse at least ten or more times. A "Case Recording Summary" prepared by Ms. Orsulak in January 2016 also noted that the victim received a forensic medical examination by SANE nurse at ChildHelp in December 2015. Another one, also prepared by Ms. Orsulak in January 2016, established that Ms. Orsulak went to the victim's school in Union County and spoke with the victim there.

Also, three separate orders from the Union County Juvenile Court were introduced. Those orders indicated that on February 16, 2016, the victim was placed in the custody of relatives. On March 22, 2016, the victim was removed from her relatives' home, as it was determined to be contrary to her welfare to stay in the home, and she was placed in foster care. A May 17, 2016 order indicated that the victim would remain in foster care until at least the next hearing in August of 2016.

b.      Testimony

Trial counsel was the first to testify. He stated that he was licensed to practice law in 2006; that since that time, he had tried approximately forty-six jury trials as lead counsel in both state and federal courts; and that he almost exclusively practiced criminal defense work. He said that, prior to the Petitioner's trial, he had maybe tried two or three jury trials in child sex abuse cases.

Trial counsel was retained to represent the Petitioner when "[t]he investigation was, essentially, concluded and [the case] was ready for trial." Trial counsel indicated that he was aware at the time he was retained there had been some prior juvenile court proceedings involving the victim and her stepbrother. Upon being retained, trial counsel filed motions for and received discovery materials from the State. Trial counsel confirmed that he had received a copy of, and had watched, the victim's forensic interview at ChildHelp "early on in the case." In watching the video, trial counsel ascertained details about inappropriate sexual contact between the victim and her stepbrother. Trial counsel believed that the

sexual contact between the two children was what prompted the juvenile court proceedings in Union County and resulted in their being removed from the home for a time. Trial counsel relayed that he also had discussions with the Petitioner about the victim's sexual behavior with her stepbrother.

Trial counsel testified that he had never filed a motion pursuant to Tennessee Rule of Evidence 412 prior to the Petitioner's trial and that he did not recall doing any legal research regarding Rule 412 in connection with this trial. He explained that, as he understood it, "the [stepbrother] question, as a prior inconsistent statement or as a prior statement to indicate that she had made a prior report, was not itself sexual activity" covered by Rule 412. Trial counsel asserted that, if he had it to do over again, he "certainly, without question, would have filed a 412 notice." Trial counsel claimed that his failure to file such a motion was not a strategic decision, given that he "genuinely believed that this evidence was going to be admitted on the question of prior claim, right, a prior accusation." Trial counsel affirmed his understanding of the law proved incorrect in light of the court's ruling at trial.

Trial counsel believed using this information at trial about the victim and her stepbrother was "important strategically" to the case. According to trial counsel, "the overall defense strategy" was to challenge the victim's story given "its numerous inconsistencies" regarding the timeline and to assert that she had "a reason to make up a story about her father, because of this issue with [her stepbrother], . . . in [an] effort to deflect attention" away from them. Relative to the victim's motive to lie, trial counsel explained: "[Y]ou can't say that someone's lying unless you can also explain why they would[.] . . . [A] jury will not accept . . . that someone's a liar unless they have a reason." He articulated how this insinuated a motive to lie for the victim: "That everybody's all upset about her and [her stepbrother], and she makes the allegation against her father and now everybody's all upset about her father and has forgotten to be upset with her about [her stepbrother]." Additionally, trial counsel noted another goal of introducing this evidence at trial was to establish the victim's basis of sexual knowledge:

> [I]f you have a young child who is on the witness stand describing sexual activity, there's sort of this assumption that they would not be able to do that if they had not been the victim of something, right? . . . And if there can be . . . an explanation that that knowledge came as a result of something someone else did, not [the Petitioner], then that impacts it.

Trial counsel opined that there was no inconsistency between pursuing the issue involving the victim's stepbrother and also pointing out the inaccuracies in the victim's timeline.

Trial counsel was also asked about the potential use of evidence as it related to the victim's mother's testimony at trial. He said that, through admission of this evidence, he would have been able to provide "an alternative explanation" as to why the victim was "sullen and withdrawn" upon returning from her visits with the Petitioner—because her stepbrother was abusing her.

Trial counsel noted that the jury was persuaded by some of the defense's argument because it acquitted the Petitioner of the charges at the victim's grandparents' house. He further opined that this additional argument regarding the victim's stepbrother "could only have been positive" because it would have provided "a little more ammunition and [the defense] might have won the day." According to trial counsel, he would have utilized this evidence during closing argument and argued the following to jury:

> [T]he issue with [the victim's stepbrother] is the reason why we're here; that this is an effort to draw away from this; and that whatever she knows, she learned from what's going on with [her stepbrother] and not from her father. . . . [W]e don't think she's being honest about what happened at the house, and that should inform your view of her honesty about what happened at the apartment. And all of this is because of this [stepbrother] question, this is all just a problem with [the stepbrother].

Trial counsel confirmed that he did not impeach the victim on cross-examination with her statement in the forensic interview that the act of intercourse occurred at the end of summer 2015. When trial counsel attempted to establish the victim's statement during cross-examination of Inv. Sakovich, the State objected on hearsay grounds, and the objection was sustained. The trial court then suggested that, rather than recalling the victim, the parties enter into a stipulation reflecting what the victim's testimony would have been had she been asked. Trial counsel confirmed that the parties ultimately entered into this stipulation. Trial counsel opined that the stipulation was "less effective in terms of impact on the jury" because a stipulation "is kind of dry[,]" whereas "[i]mpeachment can be dramatic[.]"

Trial counsel affirmed that there were several other inconsistencies in the victim's trial testimony versus statements she made during the forensic interview, such as whether the Petitioner called her to him before performing the sexual acts and if she recalled how she cleaned off the ejaculate on her stomach. Trial counsel said he did not recognize these statements as being inconsistent during the trial. Moreover, he did not recall forming a strategic reason not to impeach the victim on these topics.

- 23 -

Trial counsel was asked if he could have used the victim's forensic interview "to confront her as part of impeaching her testimony[.]" While trial counsel agreed that he could have used the forensic interview as an impeachment tool, he cautioned, "You always run the risk that the victim says, well, I was talking about a different time. Right? And now you've got . . . an extra incident." He further cautioned that there was also "a very real possibility that the prosecutor [would] just press play and [they would] listen to the whole thing."

Next, trial counsel reviewed the orders from the Union County Juvenile Court. He stated that, although he did not recall having these specific orders in his possession at the time of trial, he did recall having similar information. Trial counsel agreed that, based upon the information contained in these orders, it was fair to say that the victim did not live in the home with her mother and stepfather from February until at least August of 2016.

Trial counsel affirmed that the victim's testimony she had remained at her mother's house ever since the forensic interview amounted to a "point of possible impeachment, because [the defense] knew that that was not so." Trial counsel noted that when he attempted to ask the victim on cross-examination about her living situation, he was prohibited from doing so because of the trial court's 412 ruling. Had trial counsel been allowed to explore this topic, he would have used this information as an additional attack on the victim's credibility.

Trial counsel was asked about possible information at trial that reflected on the victim's mother's "credibility or bias." Trial counsel replied that there was potential "ill will" because the victim's mother and the Petitioner were no longer together, and the victim's mother was now in a relationship with the father of the victim's stepbrother. Trial counsel opined that this made the victim's mother "more inclined to preserve" her current relationship, meaning that "she's going to have a preference to put [the Petitioner] in trouble and not her stepson." He cited, for example, that the victim's mother called and reported the allegations against the Petitioner, but she did not mention the allegations regarding the victim's stepbrother. He testified that, in preparation for trial, he was unsure if he even knew the specifics of the victim's mother's report to law enforcement, but he affirmed that he "intended to argue that the [the Petitioner] angle saves [the stepbrother] or gets attention away from [the stepbrother]." He reiterated that he could not make such an argument because of the trial court's Rule 412 ruling.

Trial counsel testified that he was aware of case law providing limits on appropriate closing arguments by the State. Trial counsel confirmed that, although the prosecutor stated he had listened to the Petitioner's interview and thought it was "weird," the Petitioner's actual interview was never admitted into evidence. He thought this was the

"prosecutor's personal belief of the testimony[,]" which was improper. Referencing the prosecutor's statements that the victim was not "making things up," trial counsel opined those statements amounted to improper witness vouching. Trial counsel said that there was no point during the State's closing argument he withheld any objections for strategic reasons, however, he also noted that the main issue in this case was the victim's credibility and that the State had "to put forward some form of this argument[.]" Trial counsel clarified that objections must be chosen wisely and that it might be better to forego some valid objections so as not to emphasize certain information with the jury.

Relative to any issue of venue, trial counsel testified that he understood the legal concept, as well as that the State had the burden of establishing venue to avoid dismissal. Trial counsel confirmed that venue was established for the first five counts of the indictment with direct testimony reflecting the victim's grandparents' house was located in Knox County. He thought at the time of trial the State had met its burden of establishing venue with regard to the offenses that occurred in Country Oaks Apartments, counts 6 through 12, but by the time of the post-conviction hearing, he believed it was questionable in retrospect. Trial counsel confirmed that Inv. Sakovich was asked, "And did all these events take place here in Knox County?" to which Inv. Sakovich replied, "Yes, they did." Trial counsel opined that Inv. Sakovich's response related to the actions he took during his investigation, such as whom he talked with and where he went; but at trial, trial counsel assumed that Inv. Sakovich's response meant "all of everything" relating to the case. Trial counsel observed no one testified at trial that Country Oaks Apartments was located in Knox County. Trial counsel also did not think that "any resident of Knox County" would necessarily know where Country Oak Apartments was located, stating that it was not a "notorious and well-known" location.

Trial counsel confirmed that he did not have any discussions with the defense witnesses about issues relating to venue or provide them with any guidance to avoid volunteering information about venue. Trial counsel did not think about his question to the Petitioner's father regarding where the Petitioner and his new wife would live when they returned from their honeymoon as potentially eliciting evidence to support venue; trial counsel thought the State had established venue by that time. He testified that he did not raise the issue of venue in any post-trial pleadings or on appeal because, at those times, he persisted in his belief the State had established venue.

Finally, trial counsel testified regarding the discovery letter he sent to the State. In that letter, which was filed on July 19, 2016, trial counsel requested "all results or reports of physical or mental examinations." The State sent a discovery response on August 3, 2016, in which it stated, "No examinations or tests known to the State at this time." Trial counsel also indicated that he received "a number of discs" in this case: "There was the

911 call, I think, and [the Petitioner's] statement[.]"  According to trial counsel, he met with the prosecutor, they "went through" the prosecutor's file, and they agreed trial counsel had "what was available."

Trial counsel indicated that, if he had known the victim had undergone a forensic medical examination one month after her forensic interview that reflected there were no injuries to the victim's vagina or hymen, he would certainly have been interested in that information and would have investigated further.  He explained his potential use of the report at trial: "[I]f she's alleging that he had inserted his penis and had intercourse with her and a medical provider is saying that her hymen is intact, I think I . . . certainly would have wanted the jury to hear that."  Likewise, trial counsel would have been interested in information that when this matter was first reported to law enforcement, only an allegation of oral sex was levied.  However, he was not sure what benefit this information would have provided because it was not necessarily "a contradiction[,]" but rather, an omission.  Trial counsel did not recall seeing or receiving any DCS records from the State.

The victim's mother was next to testify.  She stated that she contacted the Maynardville Police Department in November 2015 to report the victim's claim of inappropriate sexual contact with the Petitioner, which included that the Petitioner had "touched [the victim's] private area" and had "kissed [the victim] on the mouth[.]"  Though the victim's mother did not remember the entire details of her report to the police, she affirmed that she told both law enforcement and DCS about what happened between the victim and her stepbrother, in addition to reporting the allegations against the Petitioner.  She confirmed that, after DCS began an investigation into the allegations of sexual behavior between the victim and her stepbrother, the victim was removed from the family home and placed into foster care.  She could not recall the exact date the victim was removed from their home but believed the victim was away for "almost a year."

Karen Orsulak testified that she had worked as a DCS investigator for Knox County in 2015.  This case was referred to her after a hotline call was placed in November 2015 reporting allegations of sexual abuse that involved the victim and Petitioner.  According to Ms. Orsulak, no other allegations were made during the hotline call.  However, she did not personally take the hotline call; rather, it went through a reporting system in Nashville.  Ms. Orsulak explained that not all allegations of sexual contact result in an investigation if they do not meet certain criteria for child abuse.  She opined that an age difference of less than two years between the two individuals involved may not meet such criteria.

Ms. Orsulak said that she devised a plan with Inv. Sakovich, after he was also assigned to the case, to speak with the victim and interview the Petitioner.  Ms. Orsulak also had several conversations with the victim's mother following the hotline call.  Later,

a forensic interview for the victim was arranged with ChildHelp, during which the victim disclosed sexual contact between her and her stepbrother. Ms. Orsulak testified that this was the first instance she became aware of this information. Ms. Orsulak affirmed that the victim's mother had never mentioned in any of their prior conversations this sexual contact involving the stepbrother, although the two women did discuss it after the forensic interview. When Ms. Orsulak learned of the sexual contact involving the victim's stepbrother, she "took the steps that needed to be taken on the case."

### c. Arguments and Proposed Findings

At the conclusion of the evidentiary hearing, post-conviction counsel indicated that he desired to file a brief setting forth argument on the issues presented. The post-conviction court granted this request and indicated that post-conviction counsel had until "week after next" to get something filed. On October 17, 2022, post-conviction counsel filed a "Proposed Post-Hearing Findings of Fact and Conclusions of Law."

### 4. Post-Conviction Court's Order

The post-conviction court filed its initial order denying relief on December 13, 2022, and entered a corrected order the following day.[4] In the order, the post-conviction court first noted that the Petitioner did not testify at the post-conviction hearing. Accordingly, if any of the Petitioner's issues involved substantial issues of fact, the Petitioner had failed to meet his burden. *See* Tenn. Code Ann. § 40-30-110(a) ("The petitioner shall appear and give testimony at the evidentiary hearing if the petition raises substantial questions of fact as to events in which the petitioner participated[.]").

The post-conviction court then addressed the Petitioner's various allegations of ineffective assistance of counsel. First, the post-conviction court discussed the Petitioner's allegation that trial counsel failed to file a written motion prior to trial pursuant to Rule 412 for the purposes of introducing evidence of the victim's sexual behavior with her stepbrother. The post-conviction court determined that trial counsel was deficient for failing to file said motion, noting trial counsel's testimony that though he was aware of Rule 412, he mistakenly believed the evidence was admissible under other evidentiary rules. The post-conviction court found that, had trial counsel filed a Rule 412 motion, "the evidence would have likely been admissible to explain knowledge of sexual matters and,

---

[4] The corrected order modified one line to accurately reflect the post-conviction court's determination that trial counsel's performance during closing argument was *not* deficient.

perhaps,[5] to show a motive for the victim to lie[,]" and "the probative value would have outweighed the danger of unfair prejudice to the victim."

Addressing whether trial counsel's deficiency was prejudicial due to the omission of this evidence to explain knowledge of sexual matters, the post-conviction court noted that the victim was twelve years old when she testified at trial and that she would have been approximately eleven years old when she spoke to law enforcement about the allegations of sexual abuse. Though the victim's "knowledge of sexual matters could certainly be questioned due to her age[,]" the post-conviction court determined that the Petitioner was not prejudiced. The post-conviction court reasoned the prosecutor never contended during closing argument that, "but for the abuse of the Petitioner, [the victim] would not have [had] knowledge of these sexual matters[,]" and therefore, "[t]he issue contemplated by Rule 412 was really not an issue argued by the State or raised during the trial in this case."

Relative to whether the omission of this evidence was prejudicial due to the Petitioner's inability to establish a motive for the victim to lie, the post-conviction court noted that "[t]here was evidence presented at trial regarding how the family dynamics were affecting the victim" and that trial counsel argued to the jury "that the victim was lying because of the changes that had occurred in the family that resulted in the victim['s] feeling left out or neglected." According to the post-conviction court, "[i]t would not [have been] reasonable to argue both the desire for attention and the desire to get out of trouble for her behavior with [her stepbrother,]" given that these two theories were "contradictory in nature." The post-conviction court also noted the jurors heard both the victim and the Petitioner testify at trial and were able to judge their credibility. Finally, the post-conviction observed,

> The Petitioner presented no evidence during the post-conviction hearing that the victim was in trouble for her behavior with [her stepbrother] when this behavior allegedly occurred, when it was discovered by the family in relation to the allegations against the Petitioner, or what if any punishment the victim was subjected to because of the behavior with [her stepbrother].

For these reasons, the post-conviction court determined "the Petitioner ha[d] failed to establish by clear and convincing evidence that proof of the victim's behavior with [her

---

[5] In this regard, the post-conviction court stated in a footnote,

> Whether or not the evidence would be admissible to establish a motive to lie is a close call. It is not a permissible purpose under Rule 412. However, it might qualify as evidence which is required by the Constitution in order to be able to present a defense. In any event, the evidence would have been admissible to show knowledge of sexual matters.

stepbrother] would have been a stronger argument for motive to lie than what was presented to the jury."

In conclusion, the post-conviction court stated that, "[a]fter considering all of the arguments made by the defense regarding the failure to file a Rule 412 motion, . . . the reliability of the verdict [was] not called into question." Therefore, the Petitioner had failed to establish prejudice with regard to trial counsel's deficiency.

The post-conviction court also addressed the Petitioner's argument that trial counsel was ineffective by failing to object to certain statements made by the prosecutor during closing arguments. The post-conviction court noted trial counsel's testimony that, generally, it is important to make objections wisely and that the State had to make some form of argument about the victim's credibility, given that was the primary issue at trial. The post-conviction court then stated that it had reviewed the challenged statements made by the prosecutor and determined that they did "not involve any egregious behavior" and that, "[a]lthough some of the arguments could have been worded more artfully, they [were] not obviously objectional." The post-conviction court reasoned that "it was clear that the prosecutor was appealing to reason from the facts and not trying to convince the jury to trust his opinion on the facts or his opinion on the credibility of the witnesses." In sum, the post-conviction court concluded the Petitioner had failed to establish trial counsel was deficient in this regard. Moreover, relative to the prejudice prong, the post-conviction court determined the Petitioner had not shown that, if trial counsel had objected to the arguments and the court had ordered the jury to disregard the statements, then the outcome of the trial would likely have been any different.

Relative to the issue of venue, the post-conviction court noted the Petitioner had argued that trial counsel was ineffective for "asking a question of a witness at trial that ended up establishing venue[.]" On this issue, the post-conviction court determined that the Petitioner had failed to establish either prong of ineffective assistance because he "failed to present any evidence to support" this argument. Additionally, the post-conviction court concluded "that venue was established at trial by a preponderance of the evidence and that the evidence was sufficient to support each conviction."

Finally, the post-conviction court addressed the Petitioner's *Brady* claim regarding the SANE nurse's report detailing the victim's medical examination. Addressing the elements required to establish a *Brady* violation, *see State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995), *as amended on rehearing* (Tenn. July 10, 1995), the post-conviction court found that (1) the defense requested discovery including reports by experts; (2) "[a]lthough apparently not in possession of the prosecutor, the report was certainly in possession of a state agency, DCS, and was not provided to the defense"; (3) it was "not apparent from the

- 29 -

report itself that the information was favorable" to the Petitioner; and (4) "[t]he Petitioner ha[d] not presented any testimony from an expert or other qualified witness that the medical findings contained in the report were exculpatory." Relative to favorability, the post-conviction court observed that, contrary to the Petitioner's claim, "the report state[d] that the medical findings were consistent with the victim's report of sexual assault reported to the SANE nurse which included the allegation of penile/vaginal penetration." As for materiality, the post-conviction court specified that "[w]ith no evidence to the contrary, the report itself supports the victim's allegations." Accordingly, the post-conviction court concluded that the Petitioner had "failed to establish that he was prejudiced by the absence of the report during the trial, that the report was favorable to the defense, or that the report was constitutionally material."

The Petitioner timely filed a notice of appeal with this court. The case is now before us for our review.

## II. ANALYSIS

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The burden in a post-conviction proceeding is on the petitioner to prove allegations of fact by clear and convincing evidence. *Id.* § -110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009).

### A. Motion to Continue Evidentiary Hearing

Before we address the Petitioner's substantive arguments, we consider his claim that the post-conviction court erred in denying his motion to continue the evidentiary hearing. According to the Petitioner, the post-conviction court abused its discretion when it denied the Petitioner's "reasonable request for a continuance in order to be able to present evidence, including medical evidence, regarding the significance of" the SANE nurse's medical examination report. He notes the post-conviction court denied relief on the *Brady* issue because the Petitioner had not presented any evidence "from an expert or other qualified witness that the medical findings contained in the report were exculpatory." The Petitioner surmises that "[t]he unfairness of this procedure is patent" and that the case, if relief is not granted on the record as it stands, should be remanded to provide him with another opportunity to develop this issue. The State contends the post-conviction court properly exercised its discretion in denying the Petitioner's motion to continue the evidentiary hearing.

- 30 -

The Post-Conviction Procedure Act mandates that a post-conviction court proceed under certain deadlines. For instance, an evidentiary hearing shall be held within four months of entry of the post-conviction court's scheduling order. Tenn. Code Ann. § 40-30-109(a); Tenn. Sup. Ct. R. 28, § 8(B). That deadline shall not be extended by agreement of the parties and may only be extended by order of the post-conviction court finding that unforeseeable circumstances render a continuance a manifest necessity. Tenn. Code Ann. § 40-30-109(a); Tenn. Sup. Ct. R. 28, § 8(B). But, in no case shall an extension of the evidentiary hearing exceed sixty days. Tenn. Code Ann. § 40-30-109(a); Tenn. Sup. Ct. R. 28, § 8(B). The Act further directs that "[t]he court shall rule within sixty (60) days of conclusion of the proof." Tenn. Code Ann. § 40-30-111(d). That deadline also "shall not be extended by agreement, and the deadline may be extended only by order of the court based upon a finding that unforeseeable circumstances render a continuance a manifest necessity. An extension shall not exceed thirty (30) days." *Id.*

That said, the decision whether to grant a continuance is left to the post-conviction court's sound discretion, which will only be overturned on appeal when the post-conviction court has "clearly" abused its discretion. *Teague v. State*, 772 S.W.2d 915, 928 (Tenn. Crim. App. 1988) (citing *Moorehead v. State*, 409 S.W.2d 357, 358 (Tenn. 1966)), *overruled on other grounds by State v. Mixon*, 983 S.W.2d 661, 671 n.13 (Tenn. 1999). An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied the Petitioner a fair evidentiary hearing and that the Petitioner was prejudiced as a result. *Harris v. State*, 947 S.W.2d 156, 173-74 (Tenn. Crim. App. 1996); *Brotherton v. State*, 477 S.W.2d 522, 524 (Tenn. Crim. App. 1971). The burden rests upon the party seeking the continuance to show how the post-conviction court's action was in error. *See Harris*, 947 S.W.2d at 174.

Post-conviction counsel was appointed on January 25, 2021, and had more than one-and-a-half years to investigate this case before the evidentiary hearing finally took place on October 6, 2022. During that time, post-conviction counsel sought and received six extensions of time, with the last request being filed on February 14, 2022. No motions had been filed on the Petitioner's behalf prior to that time, and post-conviction counsel had been on the case for over a year at that point. However, with the sixth request for an extension of time filed on February 14, 2022, post-conviction counsel filed three motions—one, a request for preparation of certain transcripts; another, a discovery motion seeking any information relating to the Petitioner's pro se petition filed in September 2020; and a third, a *Ritchie* request for an in-camera review of DCS records relating to the incidents of sexual contact between the victim and her stepbrother. The post-conviction court granted all three of the Petitioner's motions and ultimately turned over portions of the DCS records that "contain[ed] potential exculpatory material" to post-conviction counsel. The post-conviction court further entertained the two additional *Ritchie* motions

from post-conviction counsel that followed regarding the victim's stepbrother's forensic interview and post-conviction counsel's request to review the DCS records, in-camera in their entirety, that related to the victim's allegations of sexual abuse levied against the Petitioner.

After these motions had been dispensed with, post-conviction counsel, nonetheless, filed a motion on September 28, 2022, to continue the evidentiary hearing, just days before the hearing was scheduled on October 6, 2022. In that motion, post-conviction counsel cited two pieces of evidence that had been discovered during "last-minute preparations" requiring more investigation—(1) that the victim's mother's initial report involved only an allegation of oral sex, not vaginal intercourse, and the defense needed time to obtain a copy of that hotline call and speak with the police officer who took the mother's report, if possible; and (2) that a report detailing the victim's forensic medical examination was made, and the defense was unaware prior to that time that an examination had even been performed and needed more time to speak with medical personnel. The post-conviction court held a hearing on the Petitioner's motion on October 3, 2022, ultimately denying the motion to continue citing the time the case had been pending, and the hearing took place as scheduled.

On appeal, the Petitioner's argument focuses only on the post-conviction court's denial of his motion to continue as it pertains to the second piece of evidence—the SANE nurse's report detailing the victim's forensic medical examination. At the motion hearing, the prosecutor indicated that this was post-conviction counsel's "second time through" the file, and post-conviction counsel failed to respond to the prosecutor's allegation that this evidence had previously been made available to post-conviction counsel. Post-conviction counsel did little to illuminate why the SANE nurse's report was not discovered sooner given the more than one-and-a-half years post-conviction counsel had to prepare for the evidentiary hearing.

The Petitioner contends that the denial of a continuance prohibited him from presenting evidence regarding the significance of this report and that for the post-conviction court to use this against him in rendering its *Brady* ruling was patently unfair. However, the Petitioner failed to take any steps to ameliorate any harm from this denial. There was no evidence that the Petitioner attempted to subpoena the SANE nurse to the evidentiary hearing or that the Petitioner attempted to contact a medical expert, but the expert was unavailable. The Petitioner was also allowed to submit a brief following the hearing, but the denial of the Petitioner's motion to continue was not mentioned therein.

Mere vagaries and speculation on appeal are insufficient to support a finding that the post-conviction court abused its discretion in denying the motion to continue. *See, e.g.,*

*Keller v. State*, No. W2020-00590-CCA-R3-PC, 2021 WL 2886338, at *7 (Tenn. Crim. App. July 9, 2021) (affirming post-conviction court's denial of the petitioner's motions for continuances seeking to have an independent DNA test of the ski mask and to allow him to re-subpoena the State's DNA expert to testify at the evidentiary hearing because (1) the ski mask was not critical to the State's case, (2) the petitioner had ample time to seek independent DNA testing of the ski mask prior to his evidentiary hearing, and (3) the expert's testimony, at most, would cast doubt on the veracity of the State's DNA testimony of the ski mask); *Alston v. State*, No. W2019-00930-CCA-R3-PC, 2020 WL 3639101, at *8 (Tenn. Crim. App. July 2, 2020) (concluding that the petitioner failed to establish prejudice on appeal from the denial of his motion for a continuance or bifurcated proceeding to allow appellate counsel to testify because the petitioner had failed to present any evidence surrounding the circumstances of appellate counsel's absence from the hearing, failed to include any information regarding whether appellate counsel was under subpoena to testify at the post-conviction hearing, and had been granted two previous continuances).

Finally, the post-conviction court has a responsibility to ensure the orderly administration of its dockets and to make sure that post-conviction cases do not linger in trial courts for years. *See* Tenn. Code Ann. § 40-30-109(a); Tenn. Sup. Ct. R. 28, § 8(B). As discussed above, post-conviction counsel had previously been granted six requests for extensions of time. Also, the post-conviction court held the issue under consideration for an ample amount of time after the hearing, but the Petitioner never sought to enter any additional proof. In *Teague v. State*, a case involving a death-row petitioner's request for post-conviction relief and a writ of error coram nobis, this court affirmed the denial of the petitioner's motion to continue requesting "a reasonable opportunity to investigate the grounds alleged in the petition 'given the limited resources that were available to him.'" 772 S.W.2d at 928. The *Teague* court reasoned that the petitioner's family had retained counsel and a private investigator, who both resided in the city of the petitioner's confinement, and that they had more than seven months to investigate his cases. *Id.* In so holding, this court noted, "Theoretically, one could continue an investigation into the facts of a capital case until the person laboring under a death sentence died from natural causes." *Id.* Though not a capital case, a similar sentiment was echoed by the post-conviction court in this case in its ruling denying the Petitioner's motion to continue.

Based on the proof presented, the Petitioner has failed to establish he was prejudiced or denied a fair hearing by the post-conviction court's denial of his motion to continue seeking additional time to develop further proof surrounding the medical report. *See Harris*, 947 S.W.2d at 173-74. Accordingly, we conclude that the post-conviction court did not abuse its discretion, and the Petitioner is not entitled to relief from the

post-conviction court's denial of his motion to continue the evidentiary hearing. We now turn to the Petitioner's substantive post-conviction claims.

B.      *Brady* Evidence

The Petitioner argues that the State violated his due process rights by failing to disclose material, exculpatory evidence prior to trial, specifically, the report from the SANE nurse detailing the victim's forensic medical examination. The Petitioner contends that all four prongs of the *Brady* test have been established: (1) the material was obviously exculpatory and, even if it were not, was directly requested by the defense; (2) the information was suppressed by the State; (3) such information—showing no injuries to the hymen or labia of the child victim who alleged she was vaginally penetrated by the Petitioner, an adult male—was obviously favorable because it "was inconsistent with, or not corroborative of," the victim's story, and the defense could have used this information to argue "that the State was presenting a cherry-picked version of facts to the jury"; and (4) the evidence was material, given that this "was a very close case" where the jury acquitted the Petitioner of one series of events, and this information "could have supplied, in the eyes of one or more jurors, a reasonable doubt as to [the Petitioner's] guilt." He also observes that this was not merely a case of the State's non-disclosure, but rather, "there was an affirmative representation in the [d]iscovery [n]otice that the State was not aware of any examination."

The State concedes that the Petitioner established the first two prongs in that the Petitioner requested the information and the State failed to provide the report. However, the State contends that the Petitioner failed to show that the document at issue was favorable or material, in which case the post-conviction court properly denied relief.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady*, 373 U.S. at 87.

In *Brady*, the United States Supreme Court held that any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. *State v. Marshall*, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992). However, the State is not required to

- 34 -

disclose information that the accused already possesses or is able to obtain or information that is not possessed by or under the control of the prosecution or another governmental agency. *Id.* at 233.

To prove a *Brady* violation, a defendant must demonstrate all of the following: (1) the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is obligated to release such evidence regardless of whether it was requested); (2) the State suppressed the information, (3) the information was favorable to the defendant; and (4) the information was material. *Edgin*, 902 S.W.2d at 390. The defendant bears the burden of proving a *Brady* violation by a preponderance of the evidence. *State v. Dotson*, 450 S.W.3d 1, 94 (Tenn. 2014) (citing *Edgin*, 902 S.W.2d at 389).

Here, the Petitioner sent a letter to the State in July 2016 requesting discovery materials, including "all results or reports of physical or mental examinations." The State then sent a response, stating that "[n]o examinations or tests [were] known to the State" at that time, though the victim's forensic medical examination was performed in December 2015. At the post-conviction hearing, the prosecutor indicated that the same information available to post-conviction counsel was also available to trial counsel, however, trial counsel testified that he never saw any medical report from the SANE nurse. Because the State concedes that the first two *Brady* factors are met, and the post-conviction concluded the same, we will focus our analysis on the third and fourth *Brady* factors, i.e., whether the information was favorable and material.

Evidence "favorable to the accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson*, 38 S.W.3d at 55-56 (citation omitted). Stated another way, evidence is favorable if it "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Id.* at 56-57 (quoting *Commonwealth v. Ellison*, 379 N.E.2d 560, 571 (Mass. 1978)). Additionally, in *Johnson*, our supreme court cited with approval a Nevada case stating that evidence is favorable under *Brady* if "it provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation . . . or to bolster the defense case against prosecutorial attacks." *Id.* (citing *Mazzan v. Warden*, 993 P.2d 25, 37 (Nev. 2000)).

Moreover, the evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678).

Appellate courts review the lower court's "findings of fact, such as whether the defendant requested the information or whether the state withheld the information . . . de novo with a presumption that the findings are correct unless the evidence preponderates otherwise." *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004). "[C]onclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely de novo standard with no presumption of correctness." *Id.*

For the Petitioner's convictions for rape of a child and incest to be valid, the jury needed to be convinced beyond a reasonable doubt that sexual penetration occurred. *See* Tenn. Code Ann. §§ 39-13-522(a) ("Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than eight (8) years of age but less than thirteen (13) years of age."); -15-302 ("A person commits incest who engages in sexual penetration . . . with a person, knowing the person to be, without regard to legitimacy[,] . . . [t]he person's natural . . . child[.]"). Our Code defines "sexual penetration" as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, *however slight*, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body, but emission of semen is not required." *Id.* § 39-13-501(7) (emphasis added). There is no requirement for the State to prove injury to a child victim's vagina or that hymenal rupture occurred for these convictions to be supported by sufficient evidence. *See, e.g.*, *State v. Franklin*, 585 S.W.3d 431, 456-59 (Tenn. Crim. App. 2019) (concluding that sufficient evidence supported the defendant's convictions for rape of a child, aggravated sexual battery, and child abuse because, although there was no physical evidence of the sexual offenses, the four-year-old victim reported the abuse and consistently stated the defendant had sexually penetrated her and had her perform sexual acts, and the victim's mother testified the defendant was not acting normally following the offense); *State v. Gibson*, 973 S.W.2d 231, 234-39 (Tenn. Crim. App. 1997) (finding that sufficient evidence supported the defendant's convictions for rape of a child involving digital and penile penetration despite the victim's normal medical test and intact hymen where expert testimony explained that penetration could have occurred

consistent with the test results, the victim testified that penetration occurred, the defendant admitted to sexual contact with the child, and the statute defined sexual penetration as including intrusion "however slight").

While there is no requirement that the State prove injury to a child victim's vagina or that hymenal rupture occurred to establish penetration, evidence is favorable if it "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Johnson*, 38 S.W.3d at 56-57 (quotation omitted). Certainly, if the victim's medical examination did in fact reveal vaginal injury or hymenal rupture, such would have been weighty, corroborative proof in support of the victim's allegations and, thus, bolstered her credibility. But, depending upon the nature of the allegations, the absence of these findings may also bear on the victim's credibility. The SANE nurse's report could have provided aid to the Petitioner's case by calling into question a material, although not indispensable, element of the prosecution's version of the events and challenging the victim's credibility. *Cf. Lingle v. Iowa*, 195 F.3d 1023, 1027 (8th Cir. 1999) (noting, in a child sexual abuse case, that "[p]erhaps, . . . the [victim's medical] report could have been used to raise doubts in the jurors' minds as to [the defendant's] guilt or innocence"); *Bautista v. State*, 474 S.W.3d 770, 779-80 (Tex. App. 2014) (indicating, in a conviction for continuous sexual abuse of a child, that if the defendant had proven the victim's medical records contained information the victim's hymen remained intact, such would have been favorable to the defense). Accordingly, we agree with the Petitioner that the evidence was favorable because it "was inconsistent with, or not corroborative of," the victim's story and conclude that the Petitioner has successfully established the third *Brady* factor for this reason.

Turning to our examination of the fourth *Brady* factor—materiality—we observe that the report does not conclusively establish whether the victim had or had not been penetrated prior to the medical examination performed by the SANE nurse. Indeed, the report itself indicates that, despite the lack of vaginal injury or hymenal rupture, the victim's physical examination was consistent with her account of the abuse. The examination took place sometime after the last incident of intercourse. Moreover, as noted by the post-conviction court, the Petitioner failed to present any proof that would establish the exculpatory nature of the report. Again, there was no evidence that the Petitioner attempted to subpoena the SANE nurse to the evidentiary hearing or that the Petitioner attempted to contact a medical expert, but the expert was unavailable. In addition, the Petitioner made no efforts in the two plus months following the evidentiary hearing before entry of the post-conviction court's order to place any relevant proof on this issue before the post-conviction court.

In this case, the victim consistently reported that the Petitioner raped her, which included an allegation of penile penetration: to her mother, during the forensic interview, to the SANE nurse, and at trial. The SANE nurse stated in the report that the victim's "exam findings were consistent with the history provided"; a fact emphasized by the post-conviction court in its *Brady* ruling. Even if the SANE nurse's report could have been used to raise doubts in the jurors' minds as to the Petitioner's guilt or innocence, there is a considerable difference between merely raising doubts and the creation of a "reasonable probability" that the trial's "result . . . would have been different" had the prosecutor made a timely disclosure of this evidence. *See Bagley*, 473 U.S. at 682; *e.g.*, *Ives v. Boone*, 101 Fed. Appx. 274, 287 (10th Cir. 2004) (in an incest case, holding that a medical report stating "the victim's 'hymen was thought to be intact'" did "not conclusively establish the victim had not engaged in sexual intercourse prior to the 1987 examination"; thus, the petitioner's *Brady* claim was "without merit because the report [was] neither exculpatory nor material"); *Lingle*, 195 F.3d at 1027 (concluding, in a child sexual abuse case where the victim alleged digital and penile penetration, that the State's failure to disclose an examination report showing the victim's hymen was intact did not satisfy the fourth *Brady* factor because "[t]here is a considerable difference . . . between merely 'raising doubts' and the creation of a reasonable probability that the trial's result would have been different" (quotation omitted)); *Bautista*, 474 S.W.3d at 780 (holding, in a conviction for continuous sexual abuse of a child, that even if the medical records established the victim's hymen was still intact, the defendant still failed to prove the victim could not have suffered sexual abuse and maintained an intact hymen, and "[t]he mere possibility that an item . . . might have helped the defense or might have affected the outcome of the trial does not establish 'materiality' in the constitutional sense) (citation omitted)). While the SANE nurse's report was favorable to the Petitioner, it was not material in the sense that there is a reasonable probability that disclosure before trial would have caused a different result. *See Bagley*, 473 U.S. at 682. Accordingly, we conclude that the absence of the SANE nurse's report from the Petitioner's trial does not "destroy confidence" in the reliability of his convictions. *See Kyles*, 514 U.S. at 439. We hold the SANE nurse's report fails to meet the required constitutional standard of materiality.

In addition, the Petitioner, in discussing materiality, observes that this is not merely a case of non-disclosure, but one where the State made an affirmative misrepresentation regarding the report's existence. However, in *Brady*, the Supreme Court held that constitutional due process is violated when a prosecutor suppresses evidence favorable to a defendant "where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution*." 373 U.S. at 87 (emphasis added). "The mere possibility that an item of undisclosed information . . . might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United*

*States v. Agurs*, 427 U.S. 97, 109-10 (1976). For these reasons, we conclude that the Petitioner has failed to satisfy the fourth *Brady* factor, and he is not entitled to relief.

C.      Ineffective Assistance of Counsel

In this appeal, the Petitioner asserts that he received the ineffective assistance of counsel at trial and on direct appeal.[6] The Petitioner contends that trial counsel was ineffective because he (1) failed to file a pretrial motion pursuant to Tennessee Rule of Evidence 412 seeking to have evidence of the victim's sexual interactions with her stepbrother admitted for various purposes, (2) failed to object to the State's improper closing argument, and (3) failed to properly address the issue of venue. We will address each of the Petitioner's contentions in turn.

On appeal, the Petitioner argues he is entitled to post-conviction relief due to multiple instances of the ineffective assistance of counsel. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980); *Dellinger*, 279 S.W.3d at 293. When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," and reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. *Rhoden v. State*, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones

---

[6] As noted previously, trial counsel also represented the Petitioner in his direct appeal.

based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different[.]" *Vaughn v. State*, 202 S.W.3d 106, 119 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

"Questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). On appeal, we are bound by the post-conviction court's findings of fact on appeal unless we conclude that the evidence in the record preponderates against those findings. *Id.* Because they relate to mixed questions of law and fact, the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial are reviewed under a de novo standard with no presumption of correctness. *Id.* at 457.

1.      Tennessee Rule of Evidence 412 Motion

The Petitioner argues that "his right to the effective assistance of counsel was violated when [trial counsel] failed to file a Rule 412 motion and thus was unable to introduce evidence of the [victim's] sexual activity with her stepbrother." The Petitioner notes trial counsel's testimony that he was unaware evidence of this sexual behavior was governed by Rule 412 and that he did not research Rule 412 or file a pretrial motion. We agree with the Petitioner, and the post-conviction court, that this evidence constitutes "sexual behavior" governed by Rule 412.

Tennessee's rape shield rule, which is found in Tennessee Rule of Evidence 412, "was enacted to reflect the general view that evidence of prior sexual behavior is irrelevant or, if relevant, has little probative value compared to its prejudicial effect, unless the evidence is within one of the enumerated exceptions." *State v. Brown*, 29 S.W.3d 427, 429-30 (Tenn. 2000). Rule 412 "recognizes that, despite the embarrassing nature of the proof, sometimes the accused can only have a fair trial if permitted to introduce evidence of the alleged victim's sexual history." Tenn. R. Evid. 412, Advisory Comm'n Cmts. (2005 amendment). The rule's "purpose is to exclude all evidence regarding the complainant's

prior sexual behavior unless the procedural protocol is followed and the evidence conforms to the specifications" of the rule. *Brown*, 29 S.W.3d at 430.

Rule 412 defines "sexual behavior" as "sexual activity of the alleged victim other than the sexual act at issue in the case." Tenn. R. Evid. 412(a). "This broad definition 'deals with sexual intercourse as well as every other variety of sexual expression.'" *State v. Wyrick*, 62 S.W.3d 751, 770-71 (Tenn. Crim. App. 2001) (quoting *State v. Sheline*, 955 S.W.2d 42, 47 n.6 (Tenn. 1997)). The provisions of Rule 412(c) provide, in pertinent part, as follows:

> Specific Instances of Conduct. Evidence of specific instances of a victim's sexual behavior is inadmissible unless . . . the evidence is:
>
> (1)     Required by the Tennessee or United States Constitution, or
> (2)     Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or
> (3)     If the sexual behavior was with the accused, on the issue of consent, or
> (4)     If the sexual behavior was with persons other than the accused, [and is offered]
>> (i)     to rebut or explain scientific or medical evidence, or
>> (ii)     to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or
>> (iii)     to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

Relative to the procedure to be followed, Rule 412 provides that if a defendant intends to offer evidence regarding specific instances of conduct of the victim's sexual behavior, then the defense must "file a written motion to offer such evidence." Tenn. R. Evid. 412(d)(1). This motion

> shall be filed no later than ten days before the date on which the trial is scheduled to begin, except the court may allow the motion to be made at a

- 41 -

later date, including during trial, if the court determines either that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence or that the issue to which such evidence relates has newly arisen in the case.

*Id.* (d)(1)(i). In addition, the motion "shall be served on all parties, the prosecuting attorney, and the victim[,]" and it "shall be accompanied by a written offer of proof, describing the specific evidence and the purpose for introducing it." *Id.* (d)(1)(ii), (iii). Finally, if the trial court determines that the evidence meets the admissibility requirements of the rule and that the probative value of the evidence outweighs its unfair prejudice to the victim, "the evidence shall be admissible in the proceeding to the extent an order made by the court specifies the evidence which may be offered and areas with respect to which the alleged victim may be examined or cross-examined." *Id.* (d)(4).

### a.     Multiple Avenues for Admission

To properly frame our analysis of these issues, we find it necessary to discuss how the Petitioner's argument was presented in his post-conviction petitions, as opposed to how it was presented by post-conviction counsel in closing argument at the evidentiary hearing, in the "Proposed Post-Hearing Findings of Fact and Conclusions of Law" submitted to the post-conviction court following the evidentiary hearing, and, likewise, on appeal. To do so, we must set forth some additional procedural background.

In the post-conviction petitions, the Petitioner first argued that trial counsel was ineffective for failing to file a Rule 412 motion seeking to introduce evidence of the victim's sexual activity with her stepbrother, detailing that such activity was admissible to show the victim's sexual knowledge and her motive to fabricate allegations against the Petitioner. Then, as a separate enumerated issue, the Petitioner contended that trial counsel was ineffective for failing to file a Rule 412 motion seeking admission of this evidence, thereby, precluding him from arguing

that the reason the [victim] was depressed when returning to the home of [her mother and stepfather] was not . . . because she had been abused by [the Petitioner,] but rather[,] because she was returning to a home where she had been and was being abused by her stepbrother or was in a relationship she found shameful or embarrassing or was concerned would be discovered.

In another enumerated allegation, the Petitioner submitted that trial counsel's ineffectiveness relative to Rule 412 precluded him from "attack[ing] the [victim's]

- 42 -

inaccurate testimony that she had been at her mother's house ever since reporting the allegation."

Next, he levied separate ineffective assistance allegations involving trial counsel's failure to adequately question the victim's mother about (1) "her decision to inform DCS and/or law enforcement that the [victim] had disclosed an allegation against her father but not to inform DCS and/or law enforcement that the [victim] had disclosed an allegation against her stepbrother"; and (2) "her failure to comply with the safety plan ordered by the Juvenile Court, which resulted in the [victim's] being taken into DCS custody[.]" According to the Petitioner, such questioning of the victim's mother "would have cast doubt on" her credibility. Finally, as it related to these topics, the Petitioner argued that trial counsel was ineffective for failing to argue "that the State had opened the door to presentation of evidence regarding the [victim's] whereabouts" when the victim testified that she had remained at her mother's house ever since making the allegations against the Petitioner, specifically, evidence that the victim had been removed from the custody of her mother and stepfather.

Then, following the conclusion of the proof at the evidentiary hearing, post-conviction counsel concentrated his ineffectiveness argument regarding evidence of the victim's activity with her stepbrother on two specific enumerated avenues for relief pursuant to Rule 412—knowledge of sexual matters and motive to lie. Similarly, in the Petitioner's "Proposed Post-Hearing Findings of Fact and Conclusions of Law"—the Petitioner's deficiency argument focused on whether the evidence would have been admissible under Rule 412 to show the victim's knowledge of sexual matters or, pursuant to the Tennessee or United States Constitutions, her motive lie. *See* Tenn. R. Evid. 412(c)(1), (4). Relative to prejudice, the Petitioner argued that there was a reasonable probability that introduction of this information would have led to a different outcome and pointed to "a variety of ways" in which this evidence would have been useful to the defense—(1) establishing the victim's motive to lie; (2) explaining the victim's mother's testimony regarding the victim's demeanor that the victim was withdrawn upon returning from the Petitioner's home and that after the disclosure of the Petitioner's abuse, the victim acted as if a weight had been lifted; (3) showing the victim's mother's bias because she only informed DCS and law enforcement about the victim's allegations against the Petitioner, but did not mention the sexual activity between the victim and her stepbrother; (4) impugning the victim's credibility relative to her testimony that she had lived with her mother ever since reporting the allegations; and (5) providing the source of the victim's knowledge of sexual matters. According to the Petitioner, the inclusion of this information for these reasons could have led to a different outcome, particularly where, as here, "the State's evidence was already flawed enough that the jury rejected an entire set of counts relating to the [victim's grandparents'] house[.]"

The post-conviction court, in its ruling on the Petitioner's ineffectiveness claim regarding Rule 412, restricted its discussion to the two avenues for admission as set forth in the Petitioner's post-hearing brief. The post-conviction court noted trial counsel's testimony that, although he was aware of Rule 412, he mistakenly believed the evidence was admissible under other evidentiary rules, and it concluded that trial counsel was, therefore, deficient in this regard. The post-conviction court reasoned that, had trial counsel filed a Rule 412 motion, "the evidence would have likely been admissible to explain knowledge of sexual matters and, perhaps, to show a motive for the victim to lie[,]" and it additionally determined that the probative value of the evidence "would have outweighed the danger of unfair prejudice to the victim." The post-conviction court then went on to examine prejudice as it related to these two proposed avenues of admission and concluded that the Petitioner was not prejudiced by trial counsel's deficiency.

The post-conviction court addressed separately the Petitioner's contentions that trial counsel was ineffective for failing to call the victim's mother "to testify about the disclosures of behavior with [her stepson] and the victim" and to question the victim's mother "about her failure to disclose the behavior between [her stepson] and the victim." The post-conviction court found that the Petitioner had failed to present any evidence supporting these arguments, and thus, he had not carried his burden of proof.

On appeal, the Petitioner makes the precise argument as he did in his "Proposed Post-Hearing Findings of Fact and Conclusions of Law"—i.e., his deficiency argument again focuses on whether evidence of the sexual activity between the victim and her stepbrother would have been an admissible exception under Rule 412 to show the victim's knowledge of sexual matters or her motive lie, and his prejudice argument lists the same five ways in which the evidence would have been useful in his defense to establish a reasonable probability that introduction of this information would have led to a different outcome. However, the Petitioner's prejudice argument rests on the presumption that, if the evidence were admissible for one of the two enumerated reasons as it related to trial counsel's deficiency, then the Petitioner could have used the evidence in his defense in any of the five ways at trial. The Petitioner is attempting to bootstrap three additional avenues for admissibility under Rule 412 into his prejudice argument without enumerating them as separate grounds supporting trial counsel's deficiency.

Rule 412 "strikes a balance between the paramount interests of the accused in a fair trial and the important interests of the sexual assault victim in avoiding an unnecessary, degrading, and embarrassing invasion of sexual privacy." Tenn. R. Evid. 412, Advisory Comm'n Cmts. (2005 amendment). Rule 412 is generally a rule of exclusion, subject to certain exceptions. It only permits evidence of specific instances of sexual conduct by the

victim with someone other than the accused for the enumerated purposes stated therein. *See generally* Tenn. R. Evid. 412(c). The rule's intent is not to provide a defendant with unfettered use of the victim's past sexual behavior once any of the enumerated grounds for admissibility specified in the rule have been established. *See generally id.* (d)(4) (stating that "the evidence shall be admissible in the proceeding to the extent an order made by the court specifies the evidence which may be offered and areas with respect to which the alleged victim may be examined or cross-examined").

We cannot indulge any attempt to comingle these additional avenues for admissibility under Rule 412 within the Petitioner's prejudice argument. We would first need to find that the evidence was admissible for these additional purposes as it relates to the issue of trial counsel's deficiency, and the Petitioner's argument was not presented to the post-conviction court or on appeal in such a manner. Accordingly, we will only address the Petitioner's ineffectiveness claim—both deficiency and prejudice—in regard to Rule 412 as it relates to presenting evidence of the source of the victim's sexual knowledge and the victim's motive to lie.

b.      Knowledge of Sexual Matters

i.      Deficiency

The Petitioner argues that evidence of the victim's sexual activity with her stepbrother would have provided a basis for the victim's knowledge of sexual matters, and therefore, trial counsel was deficient for failing to file a Rule 412 motion seeking admission of this evidence pursuant to the sexual knowledge exception. The post-conviction court determined that trial counsel was deficient for this reason, and the State concedes trial counsel's deficiency in this respect. However, we are not bound by the State's concession. *See Clardy v. State*, 691 S.W.3d 390, 409 (Tenn. 2024). Before accepting a concession, this court should independently analyze the underlying legal issue to determine whether the concession reflects a correct interpretation of the law. *See State v. Gomez*, 163 S.W.3d 632, 654 (Tenn. 2005), *vacated on other grounds*, 549 U.S. 1190 (2007).

Here, the post-conviction court found that the evidence was admissible pursuant to the sexual knowledge exception of Rule 412 and determined that the evidence was more probative than prejudicial. *See* Tenn. R. Evid. 412(c)(4)(ii), (d)(4). Despite the State's concession on appeal, the prosecutor, at the conclusion of the evidentiary hearing, observed that "[i]t's one thing to say that this type of proof falls within the purview of Rule 412[,]" but "[i]t's another thing to say that it's actually admissible in trial." The prosecutor argued that it would not have been admissible at trial to show the source of the victim's sexual knowledge because the victim indicated that the Petitioner's abuse predated any sexual

behavior with her stepbrother. The post-conviction court interjected that it was not relevant which happened first in time and stated that "anything that happened before her testimony" could go to the victim's sexual knowledge and that the evidence would have been admissible at trial for that reason.

A minor victim's knowledge of sexual matters is typically a fact of consequence in prosecuting sexual abuse cases. *See* Tenn. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). The sexual knowledge exception to Rule 412

> will most frequently be used in cases where the victim is a young child who testifies in detail about sexual activity. To disprove any suggestion that the child acquired the detailed information about sexual matters from the encounter with the accused, the defense may want to prove that the child learned the terminology as the result of sexual activity with third parties.

*State v. Lyle*, No. E2012-00468-CCA-R3-CD, 2013 WL 1281857, at *13-14 (Tenn. Crim. App. Mar. 28, 2013) (citing Tenn. R. Evid. 412, Advisory Comm'n Cmts.). Here, the Petitioner's defense was that the victim, who was eleven years old at the time she disclosed the Petitioner's abuse, fabricated the accusations against him for attention, but the victim undoubtedly had knowledge of sexual matters far beyond her age. The prosecutor mentioned during closing argument that the child victim testified in great detail about these sexual acts. As trial counsel observed during the post-conviction hearing, the jury would certainly be seeking an alternative explanation for how this knowledge came to be in a child of the victim's age.

Nonetheless, the Petitioner offers only an unrefined allegation that this sexual relationship between the victim and her stepbrother would have been relevant to provide the source of the victim's knowledge of sexual matters. The victim stated in her forensic interview that the sexual activity with the Petitioner began first. The Petitioner failed to develop any additional details at the evidentiary hearing regarding the chronology of the victim's sexual behavior as it progressed with the Petitioner and then with her stepbrother. *See* Tenn. Code Ann. § 40-30-110(f); *Dellinger*, 279 S.W.3d at 293-94.

A DCS "Case Recording Summary" included in the record on appeal details the victim's stepbrother's forensic interview that took place on January 15, 2016. The information in this summary largely discounts any allegation that the stepbrother was "perping" on the victim. In the interview, the victim's stepbrother said that the victim "approached him asking to see him naked and then asking to perform oral sex." He

indicated that this had happened "a couple of times closer to the beginning of the school year." He also mentioned that the victim had "a problem with constantly having 'urges' and wanting to masturbate." This information implies that the victim was, in fact, the one with prior knowledge of sexual matters at the time she approached her stepbrother. On the record as presently before us, we conclude that admitting this evidence at the Petitioner's trial would have offered only marginal support, if any, for the insinuation that the victim's relationship with her stepbrother provided the source of her sexual knowledge. *See State v. West*, 737 S.W.2d 790, 793-94 (Tenn. Crim. App. 1987) (holding that evidence of any sexual relationship between the young rape victim, who was the defendant's stepdaughter, and her boyfriend which occurred subsequent to the offenses charged had no tendency to make it more or less probable that the defendant had repeatedly raped his stepdaughter, and thus, such evidence was properly excluded as irrelevant to the victim's knowledge of sexual matters, and its exclusion did not violate the defendant's confrontation right).[7]

In addition, the victim also disclosed only fondling and fellatio with her stepbrother, but she disclosed, additionally, cunnilingus and intercourse with the Petitioner. These sexual acts are not substantially similar. The victim's behavior with her stepbrother, even if occurring first in time, does not explain the young victim's knowledge of these other two sexual acts. Accordingly, any probative value of this evidence is lessened given that the victim's sexual behavior with her stepbrother does not account for her knowledge of other distinct sexual acts. *See Lyle*, 2013 WL 1281857, at *14 ("Any sexual play or experimentation that the victim may have engaged in with another child is in no way relevant to the issue of how the [d]efendant's hand came into contact with the victim's genital region, unless the play or experimentation mimicked either theory of the touchings.").

Following our de novo review and for these reasons, we conclude that this evidence would have been inadmissible at trial under Rule 412 and that trial counsel was thus not deficient for failing to file a Rule 412 motion seeking admission of this evidence to explain the source of the victim's sexual knowledge. *See, e.g.*, *Colwell v. State*, No. M2019-00212-CCA-R3-PC, 2020 WL 3886031, at *11-12 (Tenn. Crim. App. July 10, 2020) (holding that trial counsel was not deficient for failing to file a Rule 412 motion so that the petitioner could question the victim about her prior sexual involvement with boys when such evidence was inadmissible). We remain steadfast in this conclusion regardless of whether trial counsel subjectively believed that the evidence was covered by Rule 412.

---

[7] *West* was decided prior to the adoption of the Tennessee Rules of Evidence under the common law definition of relevance. *See State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978) (stating that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

### ii. Prejudice

Relative to prejudice, the Petitioner maintains that, absent an answer for the jury relative to how the child victim learned of sexual matters, "even the weakest testimony . . . might well be enough to convince a jury that something must have happened—otherwise how would the [child victim] have known how to explain in any detail the mechanics of sexual acts[.]" The State responds that the Petitioner failed to establish prejudice because the victim's knowledge of sexual matters was not really in issue at the Petitioner's trial.

At the post-conviction hearing, trial counsel did not detail the depth to which he intended to explicate the victim's sexual relationship with her stepbrother but was prohibited from doing so by the trial court's Rule 412 determination. The only instance apparent from the record was when trial counsel asked the victim on cross-examination about her statement that she had remained in the house with her mother ever since making the allegations against the Petitioner. Other than intended argument on the topic, trial counsel did not indicate any additional questions he intended to ask any of the witnesses or mention any additional evidence he would have sought to introduce.

Relative to use of the victim's forensic interview, trial counsel agreed that he could have used it as an impeachment tool on the victim's cross-examination. However, trial counsel also indicated that, had he done so, the victim might have alleged an entirely separate incident of sexual intercourse and that there existed "a very real possibility that the prosecutor [would] just press play and [they would] listen to the whole thing."

Trial counsel's concerns were well-founded. If trial counsel had sought to develop evidence of the victim's sexual behavior with her stepbrother through cross-examination of the victim, the State likely would have sought and been permitted to clarify on redirect that the victim's knowledge of sexual matters originally came from the Petitioner. *See State v. Osborne*, 251 S.W.3d 1, 20 (Tenn. Crim. App. 2007) (concluding that, when defense counsel cross-examined one victim at length about her grandfather's inappropriate conduct when she was eight years old, and before she had met the other victim, the State was entitled to rebut this evidence because the jury was left with the clear implication that the first victim's grandfather was the first person to sexually abuse the victim and provide the victim with knowledge of sexual matters). Furthermore, if trial counsel had delved into the details of the victim's forensic interview, then there existed a possibility that the prosecutor could have played the entire interview. *See State v. Cox*, No. E2020-01388-CCA-R3-CD, 2022 WL 325596, at *12-13 (Tenn. Crim. App. Feb. 3, 2022) (holding that pursuant to the rule of completeness, the trial court did not abuse its discretion in allowing

the entire video of the victim's forensic interview to be played for the jury, though the defendant requested to play only the portions of the interview).

In addition, we note that the Petitioner did not introduce the victim's entire forensic interview as an exhibit to the post-conviction hearing but only introduced the thirteen-minute portion where she discussed the sexual behavior with her stepbrother. And, given that the State would have been entitled to rebut the Petitioner's evidence, any comprehensive determination of prejudice would include review of the entire forensic interview. *See* Tenn. Code Ann. § 40-30-110(f); *Dellinger*, 279 S.W.3d at 293-94.

As for the documents that were admitted at the post-conviction hearing, we observe that the DCS document titled "Child Protective Service Investigation Summary and Classification Decision of Child Abuse/Neglect Referral" provided details of the victim's entire forensic interview. It was noted in the document that the victim "gave a very detailed disclosure of the sexual abuse she endure[d] at the hands of [the Petitioner]." The victim disclosed having oral sex with the Petitioner where he "licked her," she "sucked him," she rubbed him "up and down" and "[i]t came out rubbery and warm[.]" The victim said that when the Petitioner was finished, he would "hold it at the end until hot, white, chunky stuff" came out on her stomach. She also said that he put his penis "in and out of her." The Petitioner instructed her not to tell anyone. The victim was able "to describe how her body reacted to the touches . . . as well." The victim also indicated that the abuse went on for over two years, and she finally told her mother because she wanted it to stop.

The victim's forensic interview was also detailed in a "Case Recording Summary" prepared by Ms. Orsulak on December 27, 2015. That document reflected that the victim informed the interviewer that she "finally felt comfortable" having sex with the Petitioner because they "had done it so much." According to the victim, they had engaged in intercourse at least ten or more times.

It was indeed likely that, if trial counsel had attempted to introduce evidence of the victim's sexual behavior with her stepbrother, then undesired results would have ensued. Importantly, trial counsel would have run the risk that the victim would have mentioned additional acts of intercourse with the Petitioner. Also, many of the details of the encounters between the two children do not support the Petitioner's claim that the victim's stepbrother provided the source of her sexual knowledge rather than the Petitioner. In fact, as noted above, the record reflects that the victim was the one with prior knowledge of sexual matters at the time she approached her stepbrother. Furthermore, while there were some minor inconsistencies between the victim's statements in the interview and her trial testimony, delving into these topics would have served only to show that the victim made prior consistent disclosures of sexual abuse at the hands of the Petitioner.

- 49 -

For these reasons, we cannot say that there was a reasonable probability that, absent trial counsel's failure to present an alternative source of the victim's knowledge of sexual matters, the result of the proceeding would have been different, and the jury would have discredited the victim's testimony and believed the testimony of the Petitioner and his witnesses that the abuse did not occur. Thus, we agree with the post-conviction court that the Petitioner has failed to establish prejudice for any alleged deficiency in this regard.

### c. Motive to Lie

The Petitioner submits that this evidence was admissible to show the victim's motive to lie and that its admission was required by the United States and Tennessee Constitutions, thus, an exception to the prohibition as stated in Tennessee Rule of Evidence 412. According to the Petitioner, "[t]here are well recognized examples of situations where the United States Constitution requires that specific act proof be admitted into evidence to prove that a key government witness had a motive to lie." In support of his argument, the Petitioner cites two cases mentioned in the Advisory Commission Comments to Rule 412: *State v. Jalo*, 557 P.2d 1359 (Or. Ct. App. 1976); and *Commonwealth v. Black*, 487 A.2d 396 (Pa. Super. Ct. 1985).

The State first notes the post-conviction court's ruling that the evidence could "perhaps" be used for this purpose under Rule 412's constitutional exception. The State asserts that, despite the post-conviction court's ruling suggesting that the evidence was admissible for this purpose, the Petitioner "has not shown that this is the law in Tennessee," especially where he could present "proof of *a* motivation to lie[,]" i.e., that the victim was feeling neglected and wanting attention.

### i. Deficiency

The post-conviction court here did not make a definitive determination on whether the evidence was admissible to show the victim's motive to lie, finding only that it was "perhaps" admissible. It appears that, for the sake of analysis, the post-conviction assumed this evidence was admissible for this purpose pursuant to the constitutional exception of Rule 412, given that it had already determined that the evidence was admissible to establish the victim's knowledge of sexual matters, but ultimately denied relief due to the Petitioner's failure to demonstrate prejudice. We repeat that merely because evidence is admissible for one purpose under Rule 412 does not mean that it becomes admissible to use for any and every purpose during trial. With this principle in mind, we turn to our de novo review of whether trial counsel was deficient in this regard.

Initially, we observe, contrary to the post-conviction court's conclusion, that the defense could have proceeded simultaneously with both theories regarding the victim's motive to lie, i.e., that the victim accused the Petitioner to deflect attention away from her sexual behavior with her stepbrother and also that the victim felt neglected and wanted attention. The simple fact that these theories might have been seen as somewhat contradictory in nature would not have precluded the Petitioner from pursuing both in the hope of obtaining a not guilty verdict. Trial counsel "may reasonably decide as a matter of strategy to present alternative, even inconsistent defense theories to the jury[.]" *Felts v. State*, 354 S.W.3d 266, 280 (Tenn. 2011) (citation and footnote omitted).

Turning to the requirements of Rule 412, in addition to establishing specific circumstances in which evidence of a victim's prior sexual history may be admissible, the rule also states that such evidence is admissible if required under either the Tennessee or United States Constitutions. Tenn. R. Evid. 412(c)(1). The Sixth and Fourteenth Amendments to the United States Constitution guarantee the accused the right to present a defense, which includes the right to present witnesses favorable to the defense. *Brown*, 29 S.W.3d at 432. A denial or "significant diminution" of this right endangers the integrity of the judicial process. *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). "Although this right is critical, at times it 'must yield to other legitimate interests in the criminal trial process,' including 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Wyrick*, 62 S.W.3d at 770 (quoting *Brown*, 29 S.W.3d at 432). "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007). Ordinarily, an evidentiary decision does not rise to the level of constitutional error. *Id.* In determining error,

> [t]he facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.

*Brown*, 29 S.W.3d at 433-34.

Relative to whether the constitution requires admission of certain evidence of a victim's history of sexual behavior, the comments to Rule 412 cite two examples from other states that involve a victim's motive to lie: *Jalo*, 557 P.2d 1359; and *Black*, 487 A.2d 396. Tenn. R. Evid. 412, Advisory Comm'n Cmts. (2005 amendment); *see also Sheline*,

955 S.W.2d at 48.  In the first case from Oregon, the defendant, in a rape-sodomy case, claimed that the ten-year-old victim falsely accused him of rape to garner sympathy for herself after the defendant had threatened to tell the victim's parents about her active sexual conduct with others.  *Jalo*, 557 P.2d at 1360.  The Oregon court concluded that the defendant's right to confrontation was violated when the rape shield law prevented him from proving the victim's "ulterior motive for making a false charge" against the defendant.  *Id.* at 1361-62.  In the second case from Pennsylvania, the defendant, in a rape-incest case, was prevented from trying to show that his thirteen-year-old daughter accused him of rape to get him out of the house so that her older brother, with whom the defendant had been quarrelling, would return home and they could renew their sexual relationship. *Black*, 487 A.2d at 398.  The Pennsylvania court held that, where "the Rape Shield Law purports to prohibit the admission of evidence which may logically demonstrate a witness' bias, interest or prejudice or which properly attacks the witness' credibility, it unconstitutionally infringes upon an accused's right of confrontation under the Sixth Amendment to the United States Constitution[.]"  *Id.* at 401-02 (footnote omitted).

However, the victim's alleged motive to lie here is distinguishable from those present in *Jalo* and *Black*.  The victims in both of those cases had a precise motivation to fabricate a story against the defendants exclusively.  Not so here.

In her report, the SANE nurse stated that the victim's mother had informed her that the victim's stepfather caught the victim and the victim's stepbrother "touching each other without their clothes on" and that "[a]fter this, [the victim] disclosed . . . what was happening with [the Petitioner]."  In the victim's forensic interview, the victim indicated that after being asked questions by her stepfather, she and her stepbrother disclosed their behavior.  Though the victim said she first divulged the sexual behavior with her stepbrother before revealing the abuse by the Petitioner, the victim did not indicate whether this occurred during the same conversation or what prompted the additional disclosure. The victim told the interviewer that because of her behavior with her stepbrother, they were both grounded for three weeks and that they were still grounded at the time of the interview.

But again, the Petitioner offers only a bare allegation that this sexual relationship between the victim and her stepbrother would have been relevant to establish a motive for her to fabricate the allegations against the Petitioner.  *See* Tenn. Code Ann. § 40-30-110(f); *Dellinger*, 279 S.W.3d at 293-94.  The Petitioner did not question the victim's mother at the evidentiary hearing about the details surrounding the discovery of the victim's and her stepson's sexual behavior, the substance of the family's conversations on these matters, or the punishment meted out to the victim and her stepbrother following the disclosure.  The Petitioner has failed to present evidence, which was available to him, reflecting the exact

timing of the victim's disclosures or the tone of the various conversations with her parents surrounding the separate incidents, such as whether there was any aggressive questioning by her mother or stepfather that led to the disclosure involving the allegations against the Petitioner. In fact, the victim's punishment for her behavior with her stepbrother, by her own statement, did not appear to have been lessened in any way following her accusations against the Petitioner.

While certainly true that the victim's disclosure of sexual abuse at the hands of the Petitioner happened shortly after the victim's being discovered engaging in sexual behavior with her stepbrother, it was only speculative that the victim faced any parental pressure that would have led her to identify an additional individual, particularly her father, as a perpetrator of unrelated sexual abuse. Revealing that the victim engaged in sexual acts with her stepbrother, by itself, does little to shed light on why the victim would also be motivated to accuse the Petitioner specifically, of all the people in the world, her biological father, of sexually abusing her. *See, e.g.*, *State v. Quinonez-Gaiton*, 54 P.3d 139, 144 (Utah Ct. App. 2002) (making a similar comment in determining that the exclusion of evidence of the child victim's sexual encounter with his stepbrother was proper where the defendant, who had lived in the household with the victim for approximately five years, could have challenged the child victim's credibility and motive to identify the defendant as his abuser without revealing that sexual conduct). The Petitioner has failed to establish any genuine causal connection between the discovery of the victim's sexual activity with her stepbrother in relation to her motive to fabricate allegations of sexual abuse against the Petitioner, other than their imprecise nearness in time.

Furthermore, the Petitioner's defense in this regard is not particularly viable. For example, this is not a case where the Petitioner defended the charges based upon a theory of misidentification, meaning that the victim accused him, but it was actually someone else, in this case, the stepbrother. *See Arnold v. State*, No. M2018-00710-CCA-R3-PC, 2020 WL 569928, at *35 (Tenn. Crim. App. Feb. 5, 2020) (finding an attorney's failure to renew the Rule 412 motion was prejudicial because the timing of the sexual contact between the minor victim and the other individual was crucial in showing that the other individual was responsible for the offenses described in the indictment, rather than the petitioner). Any probative value of the evidence was indeed minimal.

For these reasons, we cannot say that admission of this evidence for this purpose was critical to the Petitioner's defense. *See Brown*, 29 S.W.3d at 433-34. Moreover, while the evidence bears sufficient indicia of reliability, "the interest supporting exclusion of the evidence is substantially important" in our assessment. *Id.* The introduction of the complete details of the victim's relationship with her stepbrother would have done little more than result in a "trial of the [minor] rape victim based on her past sexual conduct,"

- 53 -

the exact opposite result to the purpose of the rape shield law. *Sheline*, 955 S.W.2d at 44. Accordingly, to the extent the post-conviction court suggested that such evidence would have been admissible at trial, we respectfully disagree, and for that reason, determine that trial counsel was not deficient in this regard. *See, e.g.*, *Colwell*, 2020 WL 3886031, at *11-12.

### ii. Prejudice

Relative to prejudice, the Petitioner argues that, without this evidence, the defense had no compelling proof to explain why the victim would have made a false allegation against the Petitioner. According to the Petitioner, trial counsel could have used this information to construct "a straightforward and entirely plausible narrative of fabrication," that being that when the victim's sexual activity with her stepbrother was discovered, she attempted "to deflect the blame away from herself by pointing to someone else as a perpetrator and characterizing herself as a victim." And given that this developed "into a very serious matter, [she] decided it was easier to continue with the allegation rather than retract it."

The State responds that the Petitioner cannot establish prejudice because he was already able to present proof of the victim's motive to lie at trial, i.e., she was feeling neglected and wanted attention, so she made up the allegations. According to the State, "[p]resenting an alternate theory that directly contradicts this motivation—by arguing [the victim] wanted to deflect attention away from her—would weaken the [P]etitioner's defense rather than bolster it, as he would appear to be desperate." The State also notes that the jury heard the Petitioner's testimony and assessed his credibility and that he "cannot establish a reasonable probability that simply presenting an alternate motivation to lie would [have] cause[d] the jury to reject its determination that he was the one who was lying."

Similarly, we cannot say there was a reasonable probability that, absent trial counsel's failure to present this alternate motivation for the victim to lie, the result of the proceeding would have been different, and the jury would have discredited the victim's testimony and believed the testimony of the Petitioner and his witnesses that the abuse did not occur. As noted above, if trial counsel had sought to develop this inference through cross-examination of the victim, the State likely would have been permitted to clarify on redirect that the victim's knowledge of sexual matters originally came from the Petitioner. *See Osborne*, 251 S.W.3d at 20. Furthermore, the recording of the victim's forensic interview, which presumably contained prior consistent statements by the victim, could have been played for the jury to rehabilitate her credibility after it was impeached by the Petitioner on cross-examination when he suggested she had a motive to lie. *See Cox*, 2022

WL 325596, at *13-14; *see also State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993) (concluding that a prior consistent statement may be admissible when a witness is impeached through the introduction of a prior inconsistent statement that suggests that the witness's testimony was either fabricated or based upon faulty recollection).

Had trial counsel elicited this information, all of the graphic details that the victim recounted in her interview would likely have been placed before the jury—such as her assertions that intercourse with the Petitioner had taken place over ten times and that she had become so accustomed to the act that it no longer hurt. Moreover, the jury could have viewed this sexual activity between the victim and her stepbrother as evidence of the victim's acting out as a result of the Petitioner's abuse, and thus, entirely corroborative proof that she was sexually abused by the Petitioner as she claimed.

In his prejudice analysis, the Petitioner notes that the jury found him not guilty of the first set of offenses alleged to have occurred at the Petitioner's parents' house. The Petitioner argues that "the jury's verdict did not fully 'square with' the State's theory of the case, making it much harder to find that trial counsel's deficiencies were harmless." We cannot accept the Petitioner's assumption that the differing verdicts in this case call for the conclusion that the jury had not fully accepted the State's theory of the case. Our supreme court has emphasized "the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation." *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015) (quoting *United States v. Zane*, 495 F.2d 683, 690 (2nd Cir. 1974)). A jury's acquittal can occur for a multitude of reasons, such as a variance between the dates of the offenses in the indictment and the testimony at trial, a rationale that is not entirely improbable in this case given our review of the underlying trial record. Or an acquittal can represent nothing more than a jury's exercise of lenity. *See Dunn v. United States*, 284 U.S. 390, 393 (1932) ("We interpret the acquittal as no more than [the jury's] assumption of a power which they had no right to exercise, but to which they were disposed through lenity.") (quoting *Steckler v. United States*, 7 F.2d 59, 60 (2nd Cir. 1925)); *see also Wiggins v. State*, 498 S.W.2d 92, 93 (Tenn. 1973). Here, we are dealing with allegations levied by a twelve-year-old child victim. The jury found the victim credible relative to the second set of offenses and the State's proof sufficient beyond a reasonable doubt. For the reasons stated, the fact that the jury found the Petitioner not guilty of the first set of offenses is not determinative for the purposes of our prejudice analysis.

Finally, we note that the Petitioner was able to present a motive for the victim to lie at trial, that of her feeling neglected and wanting attention. Accordingly, we affirm the post-conviction court's conclusion that the Petitioner was not prejudiced by any alleged

deficiency regarding trial counsel's failure to file a Rule 412 motion and seek introduction of evidence of the victim's sexual activity with her stepbrother. This issue is without merit.

2.      Closing Argument

The Petitioner next argues that "trial counsel provided ineffective assistance in failing to object to the egregiously improper arguments of the State[.]" According to the Petitioner, the challenged comments were improper because they constituted repeated vouching for the victim's credibility by the prosecutor, interjected the prosecutor's personal opinions into the case, and went beyond the evidence introduced at trial or were inconsistent with the evidence. The Petitioner contends that trial counsel's failure to lodge simultaneous objections to these statements constitutes deficient performance. And the Petitioner asserts that he was prejudiced by trial counsel's failure in this regard: "Given the close nature of this case, there is a reasonable probability of a different outcome had counsel properly performed his role and objected to the improper arguments."

The State responds that the post-conviction court properly determined that the Petitioner failed to show either deficiency or prejudice. The State surmises that the challenged statements do not intentionally misstate the evidence, do not express a personal opinion on the evidence or the Petitioner's guilt, do not intentionally refer to or argue facts outside the record, and do not amount to improper vouching; thus, trial counsel was not deficient in failing to lodge objections to these statements. The State also submits that even if an objection were somehow warranted, the Petitioner cannot establish prejudice because the prosecutor focused on the specific facts to which the victim testified, the prosecutor also told the jury that it would have to use its own common sense and gauge witness credibility on its own, and finally, the fact that the jury returned acquittals on multiple charges showed that it was not overwhelmed or inflamed by any improper argument.

Closing arguments are intended "to sharpen and to clarify the issues that must be resolved in a criminal case." *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008) (citation omitted). In closing arguments each side should "present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *Id.* (citations omitted). Although both prosecution and defense counsel in criminal cases are expected to be zealous advocates, "prosecutors must not lose sight of their duty to seek justice impartially[.]" *State v. Hawkins*, 519 S.W.3d 1, 47 (Tenn. 2017) (quotation omitted), *overruled on other grounds by State v. Enix*, 653 S.W.3d 692, 700-01 (Tenn. 2022). "Closing arguments in criminal cases have a rough and tumble quality about them because they are traditionally the one place in the trial where the lawyers are given the greatest leeway in their manner of expression." *Banks*, 271 S.W.3d at 131 (internal quotation and citation omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in

their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence or make derogatory remarks or appeal to the jurors' prejudices." *Id.* (internal citations omitted).

This court has recognized five general areas of improper closing argument by the State:

(1)     intentionally misstating the evidence or misleading the jury as to the inferences it may draw;
(2)     expressing a personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant;
(3)     making an argument calculated to inflame the passions or prejudices of the jury;
(4)     making an argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict; and
(5)     intentionally referring to or arguing facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (internal citations omitted). Moreover, "[t]he prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." *State v. Gann*, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007).

When a closing argument is found to be improper, the established test for determining whether there is reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to a defendant's detriment. *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965). In measuring the prejudicial impact of any misconduct, this court should consider: (1) the facts and circumstances of the case, (2) any curative measures undertaken by the court and the prosecutor, (3) the intent of the prosecution, (4) the cumulative effect of the improper conduct and any other errors in the record, and (5) the relative strength or weakness of the case. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see also State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984).

a.     Trial Counsel's Testimony

Trial counsel's decisions about whether to object to the arguments of opposing counsel "are often primarily tactical decisions." *Payne v. State*, No. W2008-02784-CCA-

R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010). Trial counsel could refrain from objecting for several valid tactical reasons, including not wanting to emphasize unfavorable evidence. *Id.* As a result, "testimony from trial counsel as to why he or she did not object to the allegedly prejudicial remarks is essential to determine whether trial counsel was ineffective." *Brooks v. State*, No. M2010-02451-CCA-R3-PC, 2012 WL 112554, at *14 (Tenn. Crim. App. Jan. 11, 2012). Absent testimony from trial counsel or evidence indicating that the decision was not tactical, "we cannot determine that trial counsel provided anything other than effective assistance of counsel." *State v. Sexton*, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan. 12, 2007).

Here, trial counsel was questioned at the evidentiary hearing about his decision not to object during closing arguments. He testified that he was aware of case law providing limits on appropriate closing arguments by the State but that he never objected to the prosecutor's allegedly inappropriate statements. Trial counsel opined that the prosecutor should not have commented on the Petitioner's actual interview because it was never admitted into evidence, should not have stated his personal belief on the Petitioner's testimony, and should not have vouched for the victim's credibility. Despite trial counsel's apparent legal knowledge and belief regarding the impropriety of the prosecutor's remarks, trial counsel could not explain his failure to object to any of these statements, instead asserting that there was no point during the State's closing argument that he withheld any objections for strategic reasons.

Although trial counsel did not provide an explanation for his failure to object to these comments during closing argument, he indicated that objections must be chosen wisely and that it might be better to forego some valid objections so as not to emphasize certain information with the jury. The post-conviction court credited this testimony in finding that trial counsel was not deficient in failing to object to any improper comments.

b.      Petitioner's Statements During His Interview

First, the Petitioner focuses on the prosecutor's comments regarding the Petitioner's statements when he was questioned by Inv. Sakovich. During the State's initial closing argument, the prosecutor emphasized that the Petitioner had attempted to minimize his contact with the victim by "want[ing] to impress upon" Inv. Sakovich that he had "never once" changed the victim's diaper, had "never spent any time alone with" the victim, and had "spent less than a hundred hours with her for the past year." The prosecutor then commented that "when [he] listened to that interview[,] [he] thought, that's weird." The prosecutor questioned why the Petitioner would "go to such great, almost ridiculous, lengths to minimize the contact he had with his daughter?" The prosecutor told the jury, "I would submit to you that that's because he was scared" knowing "that this story was

- 58 -

finally coming out," and the Petitioner needed to "create some separation between" himself and the victim.

The Petitioner argues that the prosecutor misstated the evidence because the Petitioner did not testify that he never once changed the victim's diaper nor that he spent less than one hundred hours with her in the past year. The State responds that the prosecutor's comments regarding changing the victim's diaper and the amount of time the Petitioner had spent with the victim in the past year do not rise to the level of intentionally misstating the evidence.

At trial, in response to cross-examination with his prior statements, the Petitioner seemingly confirmed that he had never changed the victim's diaper, but he subsequently clarified that he might have changed the victim's diaper a few times in emergency situations. When asked if he had told Inv. Sakovich that he had probably not spent "a hundred hours in the past year" with the victim, the Petitioner replied that he could not provide "a ballpark figure" but affirmed that he had not spent very much time with the victim in the past year. During closing argument, the prosecutor was recounting these facts in an effort to show the "ridiculous" lengths the Petitioner took to minimize his contact with the victim when questioned by Inv. Sakovich. We agree with the post-conviction court that the prosecutor's comments in this regard during closing argument were not a model of precision, given that the Petitioner clarified he might have changed the victim's diaper in emergency situations and that he could not provide "a ballpark figure" relative to the amount of time he had spent with the victim in the prior year, though it was not a lot. While these statements "could have been worded more artfully," they do not involve any egregious behavior on the part of the prosecutor. Accordingly, we conclude that these statements do not amount to an intentional misstatement of the evidence. *See, e.g.*, *State v. Spears*, No. M2023-00346-CCA-R3-CD, 2024 WL 391019, at *7 (Tenn. Crim. App. Feb. 2, 2024) (holding that, even if the prosecutor's remark referring to a portion of the defendant's statement was a misstatement of the evidence, it was not an intentional misstatement, given that it was difficult to interpret on the recorded interview and the transcript contained a typographical error), *perm. app. denied* (Tenn. Aug. 14, 2024).

The Petitioner further contends that the prosecutor's comment amounted to an expression of personal opinion or belief when he said he had listened to the Petitioner's interview and thought the Petitioner's answers therein were "weird." The State responds that this does not rise to the level of improper argument because the State was attacking the Petitioner's credibility and highlighting his attempts to minimize his contact with his daughter.

As for the prosecutor's comment that he thought the Petitioner's responses to Inv. Sakovich were "weird," a prosecutor should not assert a personal opinion as to the credibility of a witness or as to a defendant's guilt or innocence. *Goltz*, 111 S.W.3d at 6. The prosecutor, however, "may argue based upon an analysis of the evidence and the conclusion supported by the evidence." *State v. Lowe*, No. E2017-00435-CCA-R3-CD, 2018 WL 3323757, at *25 (Tenn. Crim. App. July 6, 2018) (citing Tenn. Sup. Ct. R. 8, RPC 3.4(e)(3)). Whether the prosecutor's statements qualify as misconduct often is "dependent upon the specific terminology used." *State v. Willis*, 496 S.W.3d 653, 754 (Tenn. 2016) (citing *Gann*, 251 S.W.3d at 460). Argument predicated by the words "I think" does not necessarily indicate an expression of personal opinion. *Id.* at 754-55 (citing *Gann*, 251 S.W.3d at 460). Here, the statements of the prosecutor, when viewed in the context in which they were made, do not constitute expressions of personal opinions or beliefs regarding the credibility of a witness or the Petitioner's guilt or innocence. Rather, it was a characterization of the Petitioner's responses when interviewed. The prosecutor made arguments based upon an analysis of the evidence and the conclusions supported by the evidence. *See, e.g.*, *Spears*, 2024 WL 391019, at *7 (holding the prosecutor's characterization of the defendant's statement that the victim's death was an accident as "self-serving" did not violate a clear and unequivocal rule of law); *State v. Lockhart*, No. W2018-00051-CCA-R3-CD, 2019 WL 1753056, at *9 (Tenn. Crim. App. Apr. 17, 2019) (determining that no clear and unequivocal rule of law had been breached by the prosecutor's comment, "*I think the facts of this case are pretty simple*, albeit, these kind of cases sometimes aren't the things we want to talk about or hear about. Certainly you in this case had to see *a video that, I submit, is very troubling to watch*.").

The Petitioner also indicates that the prosecutor was "describing his own reaction to listening to an interview that was not in evidence and which the jury never heard." We agree with the Petitioner that this comment was improper as it interjected facts outside the record. *See, e.g.*, *State v. Perry*, No. M2019-01311-CCA-R3-CD, 2021 WL 1111368, at *25 (Tenn. Crim. App. Mar. 23, 2021) (concluding that the prosecutor improperly referred to matters outside the record "when he discussed the role of the victim's family in [a codefendant's] plea deal and their acquiescence of the plea deal, the weight of three packets of Sweet-n-Low, and the weight of an Oreo cookie, and when he referred to [additional codefendants] as 'liars' when neither of them testified at trial and their statements were not introduced into evidence"). Even so, the prejudicial effect of this comment was limited because the prosecutor simply recounted the Petitioner's responses to Inv. Sakovich, which were also discussed during his impeachment of the Petitioner, and this isolated remark was not a pattern of improper conduct by the prosecutor. It is fundamental that an attorney's questions, comments, and arguments are not evidence. *See State v. Morrow*, No. 02CO1-9709-CR-00358, 1998 WL 351223, at *3 (Tenn. Crim. App. July 2, 1998); *see generally* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—CRIMINAL 1.07 (26th ed. 2022) ("Statements

and arguments of counsel").[8]  We conclude that this conduct was not so improper or inflammatory that it affected the verdict to the Petitioner's detriment.  *See Harrington*, 385 S.W.2d at 759.

Finally, though trial counsel gave somewhat conflicting testimony in this regard, trial counsel indicated that it was important to make objections wisely and that sometimes a weak objection would serve only to emphasize unfavorable evidence.  The post-conviction court relied upon this testimony from trial counsel in rendering its ruling.  Here, any objection to the prosecutor's remarks—which, even if improper, were not so prejudicial as to warrant a new trial—would have served only to highlight the Petitioner's unusual responses in the interview.  Accordingly, we cannot say that trial counsel's failure to object to these comments rose to the level of constitutionally deficient performance.  *See, e.g.*, *Payne*, 2010 WL 161493, at \*15 (noting trial counsel's testimony that he generally did not object during the State's closing arguments unless he determined the statements were actually prejudicial to his client and concluding that the failure to object to the closing argument did not rise to the level of constitutionally deficient performance).  Thus, any omission by trial counsel was not so serious that it fell outside an objective standard of reasonableness under prevailing professional norms.

c.     Vouching for the Victim

The Petitioner's next claim centers upon the prosecutor's comments on the victim's credibility during closing argument.  He cites to the prosecutor's repeated references that the victim "didn't make it up" and to the conclusory comment at the end of rebuttal argument, "That is absolute baloney, not true.  These things happened to this little girl, and what she said and the story that she told you is the truth."  He submits that it was improper for the prosecutor to repeatedly vouch for the credibility of the victim.  The State responds that these remarks did not constitute improper vouching because the complained-of comments stemmed from the attack on the victim's credibility made on behalf of the Petitioner in trial counsel's closing argument.

Our supreme court has condemned a prosecutor's expression of personal belief in the truth or falsity of evidence.  *See Goltz*, 111 S.W.3d at 6-7.  Vouching occurs when a prosecutor expresses a personal opinion that a witness is telling the truth.  *See State v. Sexton*, 368 S.W.3d 371, 419-20 (Tenn. 2012).  For instance, improper vouching can occur when a prosecutor uses personal examples as a way to buttress the victim's credibility or lauds the victim's general character through exalted references.  *See State v. O'Rourke*, No. M2017-00375-CCA-R3-CD, 2018 WL 4492744, at \*7 (Tenn. Crim. App. Sept. 19, 2018)

---

[8] We note that the Petitioner did not include the jury instructions in the record on appeal, nor were they included in the underlying direct appeal record.

(determining that the prosecutor impermissibly vouched for the victim's general character by describing the victim as her "hero"); *State v. Smith*, No. E2012-02587-CCA-R3-CD, 2014 WL 3940134, at *20 (Tenn. Crim. App. Aug. 13, 2014) (concluding that the prosecutor improperly used personal examples as a way to vouch for the victim's credibility). However, it is proper to point to "specific evidence which tended to" reflect on a witness's credibility. *Sexton*, 368 S.W.3d at 420.

Here, both parties summarized the crux of this case during their respective closing arguments—whether to believe the victim's testimony or to believe the testimony of the Petitioner and his witnesses. During closing argument for the Petitioner, trial counsel attacked the victim's credibility, and the prosecutor's argument in rebuttal was focused on explaining why the jury should accredit the victim's version of events and discredit the Petitioner's. As admitted by trial counsel, the State had "to put forward some form of this argument" in this regard.

The more prudent course for prosecutors is to preface such argument with "I argue" or "I submit" that a witness is credible or incredible. *See Willis*, 496 S.W.3d at 754-55; *State v. Spencer*, No. E2022-01276-CCA-R3-CD, 2024 WL 228412, at *22 (Tenn. Crim. App. Jan. 22, 2024), *perm. app. denied* (Tenn. June 20, 2024). Nonetheless, we conclude that when the prosecutor's statements are viewed in their entire context, they were based upon the evidence and were focused on trying to explain why the victim testified truthfully. Specifically, in making these remarks that the victim was telling the truth and that "she didn't make it up," the prosecutor was recounting the precise details of these offenses as they were relayed by the victim. Moreover, at the conclusion of rebuttal argument, the prosecutor reminded the jury that they were the "ultimate deciders of who's telling the truth."

Accordingly, we cannot say that the prosecutor made inappropriate comments about his personal belief in the victim's testimony. *See, e.g.*, *Spencer*, 2024 WL 228412, at *21-22 (noting concern with the prosecutor's remarks during closing argument but finding that the prosecutor did not make inappropriate statements about her personal belief in the victim's testimony and the defendant's statements to the police, but rather, to the contrary, the prosecutor's statements were based upon the evidence and were focused on explaining why the victim testified truthfully and why the State theorized that the defendant's explanations in the text messages and in the subsequent police interview were inconsistent and not credible); *State v. Hill*, No. E2015-00811-CCA-R3-CD, 2017 WL 532481, at *35 (Tenn. Crim. App. Feb. 9, 2017) (holding that despite the theme of the prosecutor's argument that certain witnesses were believable, the argument was limited to explaining why the jury should accredit the testimony of those witnesses and was focused on explaining why those witnesses testified truthfully). What is more, any objection by trial

counsel to these comments may have served to emphasize them when both parties admitted that this was the overriding issue for the jury's consideration. *See Ward v. State*, No. E2023-01024-CCA-R3-PC, 2024 WL 3206593, at *12 (Tenn. Crim. App. June 27, 2024) (rejecting an ineffective assistance claim that trial counsel failed to object to improper vouching during the State's closing argument, noting that "[t]rial counsel could have decided not to object for several valid reasons, including not wanting to emphasize the unfavorable statements" (quotation omitted)), *perm. app. filed* (Tenn. Aug. 23, 2024). Accordingly, we conclude that the Petitioner has failed to show trial counsel was deficient in failing to lodge objections to the prosecutor's remarks relating to the victim's credibility.

3.      Venue

The Petitioner argues that, because venue was not established at trial, trial counsel was ineffective by failing to raise the issue at the conclusion of the State's proof, in the motion for new trial, or on appeal. The Petitioner argues in the alternative that, if the reference to Pond Gap by the Petitioner's father on direct examination established venue, then trial counsel was ineffective in eliciting that testimony. Finally, in this regard, the Petitioner raises a stand-alone claim that venue, as a jurisdictional matter, was not established at trial.

The State responds that trial counsel's failure to challenge venue was not ineffective, given that Inv. Sakovich testified that all of the events took place in Knox County. The State then submits that the Petitioner has waived any stand-alone challenge to venue due to his failure to raise the issue on direct appeal.

The Petitioner's various claims on this point hinge on the central question of whether the State had established venue during its case-in-chief. As such, we turn to that question.

Article I, section 9 of the Tennessee Constitution provides that an accused must be tried in the county in which the crime is committed. *See also* Tenn. R. Crim. P. 18(a) ("Except as otherwise provided by statute or by these rules, offenses shall be prosecuted in the county where the offense was committed."). Our supreme court has said, "[p]roof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense and need only be proved by a preponderance of the evidence." *State v. Hutcherson*, 790 S.W.2d 532, 535 (Tenn. 1990); *see also* Tenn. Code Ann. § 39-11-201(e) ("No person may be convicted of an offense unless venue is proven by a preponderance of the evidence."). Extensive proof is not required; rather, "[s]light evidence is enough to carry the prosecution's burden of proof if such evidence is uncontradicted." *State v. Ellis*, 89 S.W.3d 584, 598 (Tenn. Crim. App. 2000) (citations omitted). Venue is a question of fact

to be determined by the jury, which may "draw reasonable inferences from the evidence" and may make its determination based solely upon circumstantial evidence. *State v. Young*, 196 S.W.3d 85, 101-02 (Tenn. 2006) (citations omitted).

The Petitioner notes that the State never asked any witness directly if Country Oaks Apartments was located in Knox County. The Petitioner also argues about the question posed to Inv. Sakovich if "all [of] these events [took] place here in Knox County." The Petitioner notes that Inv. Sakovich "did not testify as to any 'event' that actually took place at Country Oaks [A]partment[s,]" Inv. Sakovich's testimony centered on the investigation that took place, and Inv. Sakovich never testified that he visited Country Oak Apartments or the management office. According to the Petitioner, "whatever the State intended to accomplish by asking him the question, the literal meaning of his testimony that 'these events' (i.e., the ones he testified about) took place in Knox County was that each step of his investigation (interviews, visit to Cecil Johnson, etc.) took place in Knox County."

From the proof presented, it appears that at the time of these events, the victim lived with her mother and stepfather in Union County where she attended middle school. At trial, the victim testified that, when she was nine years old, the Petitioner lived with his parents in Knox County, the location of the first set of charges. The victim said that she was approximately ten years old and in the fifth grade when the Petitioner remarried and moved from his parents' house to an apartment in Country Oaks Apartments, the location of the second set of charges. Then, when the victim was eleven, the Petitioner and his family moved to a house on Ellison Road.

The victim's mother confirmed that the Petitioner's parents' house was in Knox County. To accomplish the visitation schedule that she had arranged with the Petitioner after their relationship ended, the victim's mother and the Petitioner or a member of his family would meet at "the CVS in Halls" to facilitate the victim's exchange and later at "the TVA in Halls." The victim's mother confirmed that the victim initially visited the Petitioner at his parents' house and later at an apartment in Country Oaks Apartments.

Inv. Sakovich testified that he was a police officer with the Special Crimes Unit of the KPD and that he had worked with the KPD since 2008. Inv. Sakovich said that he attended the victim's ChildHelp forensic interview. The following day, Inv. Sakovich attempted to contact the Petitioner at the Petitioner's workplace, a radio station "off of Old Kingston Pike," but the Petitioner was not present. After learning that the Petitioner was off-site working at a car dealership on Parkside Drive, Inv. Sakovich went to that location and spoke with the Petitioner. Inv. Sakovich then returned to the Petitioner's office at the radio station and talked with the Petitioner's wife.

Inv. Sakovich confirmed that the Petitioner moved from his parents' residence to an apartment in Country Oaks Apartments in the summer of 2014 and that, in the summer of 2015, he moved to a residence on Ellison Road. Inv. Sakovich went to the Petitioner's parents' Knox County residence and interviewed the Petitioner's parents and the Petitioner's sister. Relative to the Country Oaks Apartments, Inv. Sakovich indicated that he contacted "the management company at a particular apartment complex and confirm[ed] that [the Petitioner] was a tenant there for . . . a given period of time via their paper records." At the conclusion of his testimony, Inv. Sakovich said that he ended his investigation by turning over his file to the prosecutor. He was then asked, "And did all these events take place here in Knox County?", to which he responded affirmatively.

The Petitioner takes his interpretation of this question and Inv. Sakovich's response to literal extremes. As noted above, venue only need be established by a preponderance of the evidence, and venue is a question of fact to be determined by the jury, which may "draw reasonable inferences from the evidence" and may make its determination based solely upon circumstantial evidence. *Young*, 196 S.W.3d at 101-02. Based upon the testimony cited, the jury could draw as a reasonable inference from Inv. Sakovich's affirmative response that all these events occurred in Knox County that he meant the crimes for which the Petitioner was charged occurred in Knox County. *See, e.g.*, *State v. Smith*, No. 03C01-9807-CR-00259, 1999 WL 619042, at *2 (Tenn. Crim. App. Aug. 17, 1999) (holding that venue had been established when the State's proof indicated that the drug transactions took place in a particular city and that a detective, who monitored all three transactions, responded affirmatively when asked if "all these events occurred in McMinn County, Tennessee.").

Furthermore, when the victim lived with her mother in Union County, they used a pickup spot in Knox County, creating an inference that the pickup spot was halfway between her residence and the Petitioner's location in Knox County. Because the evidence was uncontradicted, slight evidence was enough to carry the day. *See Ellis*, 89 S.W.3d at 598.

Importantly, the record reveals no evidence or allegation that these particular offenses occurred in any other county. *See Ellis*, 89 S.W.3d at 598. And the Petitioner did not testify at the post-conviction hearing to indicate that Country Oaks Apartments was located somewhere other than Knox County. *See* Tenn. Code Ann. § 40-30-110(a) ("The petitioner shall appear and give testimony at the evidentiary hearing if the petition raises substantial questions of fact as to events in which the petitioner participated[.]").

For these reasons, the record shows that the State had sufficiently established venue during its case-in-chief. Because Petitioner's venue issue was meritless, trial counsel was

not deficient for failing to raise the issue during trial or in the Petitioner's motion for new trial. *See, e.g.*, *Wilson v. State*, No. W2018-01588-CCA-R3-PC, 2020 WL 7658417, at *12 (Tenn. Crim. App. Dec. 22, 2020) (rejecting a claim that trial counsel was ineffective by failing to argue the State did not establish venue for the offense of especially aggravated sexual exploitation of a minor because, although the victim did not specifically testify that the videos were filmed in Shelby County, she testified that the "massages" the petitioner performed and videotaped occurred first in their apartment in the Laurelwood Apartments, then in their apartment in the Windsor Place Apartments when she was twelve, and later in the petitioner's hotel room after he had moved out of their apartment but continued to occasionally pick her up after school and take her to his hotel room). Likewise, trial counsel was neither deficient for failing to raise the issue on appeal nor was the Petitioner prejudiced by any such failure. *See Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004) (applying the *Strickland* standard to appellate-ineffectiveness claims).

In addition, we note that trial counsel admitted that at the time of trial, he thought the State had met its burden of proving venue in counts 6 through 12—the set of offenses that occurred at Country Oaks Apartments—based largely upon Inv. Sakovich's statement that "all [of] these events [took] place here in Knox County[,]" which was why he did not raise the issue. Based upon trial counsel's testimony, it was clear that at the time, he made a strategic decision not to object at trial, raise the issue in the Petitioner's motion for new trial, or on direct appeal. Moreover, while trial counsel stated his new-found belief at the post-conviction hearing that it was questionable whether venue had been established at trial, he never emphatically stated that venue had not been proved by a preponderance of the evidence. We will not now fault trial counsel for his reasonable decision at the time to forego raising the venue issue, given that it was meritless, and any subsequent skepticism in trial counsel's mind does not affect our decision in this post-conviction proceeding.

Finally, because the State had sufficiently established venue during the direct examination of witnesses in its case-in-chief, the Petitioner similarly cannot show deficiency or prejudice as it relates to trial counsel's examination of the Petitioner's father, which elicited the Pond Gap reference. As to the Petitioner's stand-alone jurisdictional argument regarding venue, our determination that the issue lacks merit made within the confines of the Petitioner's ineffective assistance claims obviates the need for us to determine whether such a claim can be raised independently on post-conviction appeal.

D.      Cumulative Error

The Petitioner argues that the cumulative effect of trial counsel's deficiencies, coupled with the State's failure to disclose *Brady* evidence, violated his constitutional rights so that his convictions cannot stand. The State responds that the Petitioner has failed

to establish any error, much less multiple errors, rendering the cumulative effect doctrine inapplicable.

"The cumulative error doctrine exists to protect a criminal defendant's state and federal constitutional right to a fair trial." *State v. Herron*, 461 S.W.3d 890, 909 (Tenn. 2015). In the trial context, the cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010). When determining whether to apply this doctrine, a reviewing court must consider the nature and number of the errors, their interrelationship, any remedial measures taken by the trial court, and the strength of the State's case. *Id.* at 76. However, circumstances which would warrant reversal of a conviction under the cumulative error doctrine "remain rare." *Id.* (citation omitted).

In the post-conviction context, this court has concluded, relative to ineffective assistance of counsel claims, that multiple instances of deficient performance by counsel may be considered together in assessing whether a petitioner suffered prejudice. *State v. Zimmerman*, 823 S.W.2d 220, 228 (Tenn. Crim. App. 1991). A petitioner must establish that the cumulative effect of trial counsel's errors deprived the petitioner "of a meaningful defense" and placed "the reliability of the verdict in question" to such an extent that "there is a reasonable probability that the results would have been more favorable" to the petitioner. *Id.* Similarly, as noted by the Petitioner, materiality in the *Brady* sense is determined in the aggregate. *See Kyles*, 514 U.S. at 436 (stating that "[t]he fourth and final aspect of Bagley materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item") (footnote omitted)).

We have determined that no *Brady* violation occurred from the single piece of evidence cited by the Petitioner, the SANE nurse's report. In addition, we have found no instances of deficient performance. As such, there are no errors by trial counsel to accumulate, and we need not address the Petitioner's contention that a *Brady* violation may be considered together with findings of deficient performance under a cumulative error analysis in the post-conviction setting. For these reasons, the Petitioner is not entitled to relief.

## III.  CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the judgment of the post-conviction court.

_____
KYLE A. HIXSON, JUDGE